EL PUEBLO DE PUERTO RICO, apelado, *v.* FERNANDO FIGUEROA GÓMEZ y JOSÉ LUIS REYES, acusados y apelantes.

*Número:* CR-81-89      *Resuelto:* 15 de junio de 1982

*José Luis Velázquez Ruiz*, abogado de los apelantes; *Justo Gorbea Varona, Procurador General Interino*, y *Josefa A. Román García, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

A fin de impugnar y desacreditar a un testigo adverso con prueba extrínseca de prejuicio, interés o parcialidad, ¿es necesario que se sienten previamente bases en el contrainterrogatorio? De ser en la afirmativa, ¿es una norma absoluta? ¿Cuál o cuáles son los métodos forenses apropiados?

Estas interrogantes se suscitan en la apelación interpuesta por Fernando Figueroa Gómez y José Luis Reyes, declarados culpables y sentenciados por el delito de tentativa de escalamiento agravado por el tribunal de derecho. Como único error plantean la negativa del tribunal sentenciador en "admitir evidencia demostrativa de parcialidad, prejuicio, interés, simpatía y relación patrono-empleado, en el único testigo que dijo identificarlos, fundamentando erróneamente su negativa en que no se le brindó a dicho testigo oportunidad para explicar la prueba presentada, violando así [sus] derechos fundamentales".

I

La Exposición Narrativa refleja que la prueba de *cargo* consistió en el testimonio del policía Rafael Claudio, quien en síntesis declaró que el 14 de junio de 1981, como a las 3:30 a.m., durante su turno, se recibió una llamada en el cuartel por la que se enteraron de que en el interior de la Ferretería Gurabo Comercial había cuatro individuos; que inmediatamente, en unión al sargento Vélez y al policía Peña, salió para el lugar; que el sargento Vélez y el policía Peña se fueron por la parte de atrás de la ferretería y él por

la de enfrente; que al llegar a una verja, observó que había cuatro individuos en el interior, de los cuales pudo identificar a dos; que se encontraban en el segundo piso de la ferretería tirando, por un agujero en la pared, propiedad a una arena a los otros dos que estaban abajo, los que la echaban en unos sacos; que al ellos notar su presencia, corrieron hacia la parte de atrás de la ferretería, llevando tres sacos blancos llenos de mercancía, brincaron la verja y se internaron en un monte; que los persiguieron y entonces los individuos abandonaron la mercancía, la cual ocuparon; que luego notificaron al dueño de la ferretería, Sr. Primitivo Vélez Santana, quien se personó al lugar e identificó lo ocupado como mercancía suya con el sello y precio de la ferretería, la cual le fue entregada mediante recibo; que en el interior de la ferretería un cristal de la oficina estaba roto y había una pata de cabra cerca de ésta; todas las gavetas estaban fuera y los papeles en el piso; que en la parte de atrás encontraron cortada la cadena del portón y un hueco en una pared de cemento por donde los vió tirar la mercancía; que conoce de vista y pudo ver bien, porque estaba alumbrado, a los que estaban tirando la mercancía desde el segundo piso; uno era trigueño como de 5′ 8″ de estatura, con el pelo medio grifito, que residía en el "Camino Los Meléndez" y luego se enteró que se llamaba José Luis Reyes; el otro, era blanco trigueño, de aproximadamente 5′ 3″ de estatura, y entonces tenía un afro pequeño, luego se enteró que respondía al nombre de Fernando Figueroa Gómez; que no pudo ver a los otros porque fueron los primeros en irse corriendo; que ese día localizó y llevó al cuartel a Fernando y notificó al C.I.C., donde el agente Roberto Hernández se hizo cargo de la investigación.

El testigo Primitivo Vélez Santana, dueño de la ferretería atestó que el sábado, 13 de junio de 1981, a las 5:00 p.m., cerró el negocio, dejando todo en perfectas condiciones; que en la madrugada del domingo, 14 de junio, fue despertado mediante una llamada telefónica de la Policía, la

que le informó que la ferretería había sido escalada; se personó al lugar y allí estaba el policía Claudio, el sargento Vélez y el policía Peña, con la mercancía recuperada dentro de tres sacos, la que le fue entregada. Explicó y corroboró la condición de desorden y daños del local; que fue informado por la Policía que habían visto a los individuos, pero que no habían logrado alcanzarlos, y que más tarde la Policía los detuvo para investigación.

Con esta prueba el Ministerio Fiscal sometió su caso. Oportunamente, por la *defensa* declaró, en primer lugar, Manuel Román. Éste expresó que conocía al testigo de cargo, el policía Rafael Claudio, porque iba a cobrarle *"facturas de la ferretería de Primitivo Vélez"*. (T.E., pág. 3.) En esos momentos el juez de instancia detuvo el trámite y resolvió que no admitía en evidencia el testimonio, porque no se había puesto al agente Claudio "en condiciones para pasar esa materia. Esto no es para impugnar". (T.E., pág. 3.) Igual suerte corrió el otro testigo de la defensa, Juan Ramón Reyes Morales, padre del co-acusado José Luis Reyes respecto a su testimonio en torno a la actuación y reacción del policía Claudio en ocasión de ir a buscar unos papeles al cuartel para llevar a fiar a su hijo el 22 de septiembre de 1981.(¹) Declaró que allí el representante legal de su hijo los presentó ante el agente Claudio, diciéndole que se encontraba el papá, la mamá y el *hermano* del acusado, cuando en realidad era el propio acusado, y que el policía buscó los papeles, le dijo que el caso estaba en Caguas y ellos fueron allá a entregarlo. (T.E., págs. 4-5.) Surge además que al inquirir el Tribunal el propósito de esa prueba, el abogado explicó que si el acusado Reyes le fue presentado al testigo Rafael Claudio "como el hermano del acusado, [y el testigo Claudio] aceptó que e[ra] el hermano del acusado[, ello] e[ra] prueba concluyente [de] que definitivamente no lo reco-

---

(¹) Este co-acusado José L. Reyes se había "trasladado" a los Estados Unidos después de los hechos (ocurridos el 14 de junio de 1981) y antes de su arresto. No es hasta tres meses después que acontece este incidente al regresar voluntariamente.

noc[ía]". (T.E., pág. 5.) En esos momentos, el juez, luego de comentar que no recordaba que eso se le hubiese preguntado al agente, resolvió no admitir la evidencia bajo el fundamento de que para "[prueba] de impugnación hay que primero poner a la persona a impugnar, [a] que explique, a menos que obviamente no sea una contradicción, obviamente [*sic*] no sea una manifestación, una prueba en contrario, pero esto es explicable y si no pone en condiciones a la persona para explicar primero, no puede traerlo". (T.E., págs. 5–6.)

## II

Para exponer en su correcta perspectiva las cuestiones envueltas, es menester referirnos a ciertas premisas o principios elementales establecidos en las Reglas de Evidencia de 1979. La primera, que la credibilidad de un testigo puede ser impugnada por cualquier parte —incluso la que lo presentó— "mediante cualquier evidencia *pertinente*" al respecto, fundada en múltiples aspectos, que con carácter de *numerus apertus* incluyen:

(1) Comportamiento del testigo mientras declara y la forma en que lo hace.

(2) Naturaleza o carácter del testimonio.

(3) Grado de capacidad del testigo para percibir, recordar o comunicar cualquier asunto sobre el cual declara.

(4) *Existencia o inexistencia de cualquier prejuicio, interés u otro motivo de parcialidad por parte del testigo.*

(5) Manifestaciones anteriores del testigo.

(6) Sujeto a lo dispuesto en el inciso (C) de esta regla, el carácter o conducta del testigo en cuanto a veracidad o mendacidad. (Énfasis suplido.) Regla 44(B) de Evidencia.

La segunda, que esa credibilidad puede ser examinada mediante el ejercicio del derecho fundamental del contrainterrogatorio. Y tercera, las Reglas de Evidencia —producto no sólo de la estricta lógica, sino de la experiencia sobre la

conducta humana— en nuestro sistema adversativo, aspiran al descubrimiento de la verdad, evitando sorpresas. Están encaminadas hacia la economía procesal. Por ende, toda interpretación judicial debe promover esos propósitos, sin menoscabo de lograr cumplida justicia. Regla 2 de Evidencia.

Con este trasfondo conceptual en mente es que formulamos las interrogantes jurídicas planteadas. Examinémoslas en detalle. A fin de impugnar y desacreditar un testigo adverso mediante prueba extrínseca o independiente de prejuicio, interés o parcialidad, ¿es necesario que previamente se sienten las bases durante su contrainterrogatorio?

En Puerto Rico, salvo el caso de *Pueblo* v. *Ruiz*, 66 D.P.R. 355 (1946) —bajo los artículos 383 y 520 (32 L.P.R.A. secs. 1664 y 2150), sobre evidencia, del entonces Código de Enjuiciamiento Civil— no nos hemos pronunciado al respecto. Allí revocamos unas convicciones y sentencias de homicidio voluntario, portación y posesión ilegal de armas, a base de que no se permitió la impugnación de la declaración de los testigos de cargo mediante prueba tendiente a establecer el hecho de que dichos testigos estaban atestando, no lo que vieron, sino lo que ellos *convinieron* antes del juicio que habrían de declarar. Expusimos que ". . . resulta claro y evidente que el propósito de la defensa no era el de impugnar las declaraciones de Peter Girón y Lázaro Serra —supuestos únicos testigos presenciales del suceso— mediante prueba de que en otra ocasión habían hecho declaraciones contrarias a las que habían prestado en el acto de la vista, *y sí el de demostrar que lo declarado por uno y otro testigo en el juicio era el producto de un entendido o combinación entre ellos para declarar en la forma en que lo hicieron y no lo que ellos realmente habían presenciado*". (Énfasis suplido.) *Ruiz*, supra, pág. 359. Citamos, con aprobación, a *People* v. *Michalow*, 128 N.E. 228 (1920), a los efectos de que "La hostilidad de un testigo hacia el acusado puede ser probada mediante cualquier evidencia compe-

tente. Puede ser establecida mediante el contrainterrogatorio del testigo, o *presentando testigos* que puedan declarar en cuanto a *hechos* de los cuales aparezca tal hostilidad. *No es necesario examinar primero al testigo en cuanto a su alegada hostilidad".* (Énfasis suplido.) *Ruiz,* supra, pág. 360.

Desde la época en que resolvimos *Pueblo* v. *Ruiz,* supra, no hubo cambio sustancial en las normas de evidencia, hasta la adopción y promulgación de las reglas del año 1979. En éstas, la única que guarda cierta tangencia es la Regla 47(2) regulatoria del trámite sobre manifestaciones anteriores. En su inciso A establece que no es necesario que se muestre o lea a un testigo ninguna parte de un escrito al interrogársele para impugnar su credibilidad mediante lo manifestado en dicho escrito, pero, se sobreentiende que el juez requiera que se le indique al testigo la fecha y el lugar del escrito y la persona a quien fue dirigido. El juez también podrá autorizar el examen por el abogado de la parte contraria. Su inciso B preceptúa que "[a] menos que los *intereses de la justicia* requieran lo contrario, no se admitirá evidencia extrínseca sobre una declaración hecha por un testigo que resulta inconsistente con cualquier parte de su testimonio en el juicio o vista, *a menos que se le haya dado la oportunidad de explicar o negar dicha declaración . . .".* (Énfasis suplido.) Solamente adhiriéndonos a una visión hermenéutica inflexible, literal y aislada —que rechazamos— podríamos poner punto final y restringir la cuestión bajo el principio *expressio unius.* 3 *Weinstein's Evidence,* pág. 607–43 (1981).

Es menester, pues, explorar el problema en otras latitudes. La incógnita de si deben o no sentarse las bases en el contrainterrogatorio antes de producirse prueba independiente demostrativa de hostilidad —interés, prejuicio o parcialidad— ha sido objeto de innumerables decisiones judi-

---

(2) Su texto corresponde a una traducción casi literal de la Regla 613 federal de 1975.

ciales en el ámbito federal y estatal. No existe consenso unánime. Se utilizan tres criterios: (1) que no es necesario; (2) que se requieren cuando la alegada evidencia de prejuicio es una manifestación; y (3) se extiende la misma para cubrir casos en que la evidencia de prejuicio toma la forma de conducta. *Weinstein's, op. cit.*, pág. 607-42; Anno, *Necessity and Sufficiency of Foundation for Discrediting Evidence Showing Bias or Prejudice of Adverse Witness*, 87 A.L.R.2d 407 (1963); Hale, *Bias As Affecting Credibility*, 1 Hastings L.J. 1 (1950).

La tendencia mayoritaria prevaleciente es a requerirlo. En su apoyo se aducen importantes fundamentos: (1) razones intrínsecas inspiradas en la justicia. Concederle a un testigo las mismas y razonables oportunidades de negar, admitir o explicar, que las que se conceden a los testigos en ocasión de manifestaciones anteriores verbales o escritas, es de justicia. 3A Wigmore, *Evidence*, Sec. 953 (Chadbourn Rev. 1970), págs. 800-801; (2) un criterio de analogía conceptual y lógico basado en que tanto las palabras como la conducta están íntimamente interrelacionadas. Si se justifica en las primeras, con más razón cuando se trata de la segunda —Hale, *op. cit.* Como expone McCormick, "mejor requerir las 'bases' en ambas instancias o en ninguna". *Evidence*, 2da ed., 1972, Sec. 40, pág. 81; (3) una mejor práctica forense. Presentar las bases "economiza tiempo, pues dado que el testigo puede admitir [el prejuicio], se evita así producir la prueba extrínseca". *Weinstein's, op. cit.*, pág. 607-43.

Existen, además, otras consideraciones procesales prácticas que aconsejan la observancia del trámite. Si se desconoce que el testigo será impugnado, de ordinario es excusado una vez se recibe su testimonio. Ante esa situación pueden ocurrir las siguientes variantes: (a) que el testigo abandone el tribunal y resulte difícil o imposible localizarlo para darle la oportunidad de que se rehabilite en otra vista; (b) que permanezca en el recinto del tribunal escuchando lo

que acontece. Se expone entonces el proceso a perder la garantía de veracidad que la espontaneidad brinda, pues cualquier explicación ulterior puede ser producto de una reflexión ponderada, en apariencia justificada, aunque no real ni veraz; y (c) que, a petición de una de las partes, sea puesto bajo las reglas del tribunal. Ello conlleva que se le impongan de nuevo condiciones y limitaciones a su persona, posiblemente de impacto económico negativo, alargando sin necesidad su estadía en el tribunal. De ese modo, podemos anticipar que a mayor número de testigos en una causa y ante el potencial ignorado de si serán o no tachados, se duplicaría la presencia de esos testigos en los tribunales y se recargaría y haría más complejo el trámite judicial.

Una reflexión sobre la norma más congruente y armoniosa con los propósitos a que aspiran nuestras reglas nos lleva a contestar en la afirmativa la primera interrogante. No hemos podido encontrar ni se nos han demostrado argumentos de peso en su contra. La regla de exigir que se establezcan las bases en caso de una parte tener la intención de presentar prueba independiente sobre prejuicio, interés o parcialidad de un testigo, está cimentada sólidamente en fundamentos lógicos, jurídicos y prácticos.

Por otro lado, la imposición de criterios rígidos y absolutos es extraña a nuestro ordenamiento procesal y evidenciario. Tiende a opacar la figura central del magistrado y a reducirle la función rectora de adjudicar, según su conciencia individual en cada caso. Los mismos "intereses de la justicia" que guían el discernimiento bajo la Regla 47(B) citada, deben prevalecer en la solución y aplicación de la norma.

Finalmente, no es necesario un ritual especial para sentar las bases. No existe una fórmula especial. El método generalmente aceptado es contrainterrogar al testigo adverso en torno al asunto específico en que descansa el alegado prejuicio, llamándole la atención respecto a factores tales como tiempo, sitio, personas y circunstancias envuel-

tas, de forma tal que tenga la oportunidad cabal de admitir, negar o explicar el asunto. Como incidente que se produce durante el interrogatorio, se puede optar por preguntas directas sobre su estado de ánimo o interés o por preguntas indirectas más sutiles y sofisticadas que abonen a la falta de credibilidad. Lo importante es que se le dé la oportunidad al testigo hostil de aceptar, negar o explicar el motivo de parcialidad, prejuicio o interés que se va a presentar posteriormente mediante prueba extrínseca.

### III

█ Al extender al caso de autos los principios jurídicos esbozados, concluimos que procede revocar las sentencias y ordenar un nuevo juicio. El estado de derecho imperante era la norma promulgada en *Pueblo* v. *Ruiz,* supra. Fuera de que la experiencia judicial acumulada en años refleje una tendencia y predilección en la práctica forense puertorriqueña a sentar las bases —aunque no son manifestadas en todos los casos— ello no justifica la negativa del tribunal sentenciador a aceptar el testimonio de Juan A. Reyes Morales sobre la actuación y reacción del policía Claudio en el cuartel cuando, supuestamente, no reconoció al hijo del señor Reyes. Esa prueba *no* estaba sujeta a que se sentaran las bases previamente. Era evidencia de carácter *contradictorio.* Su presentación procedía, sin menoscabo de que el Ministerio Fiscal oportunamente la refutara, para demostrar las circunstancias particulares que concurrieron en el cuartel, (3) sentando a declarar al policía Claudio.

---

(3) Como afirma el Procurador General, del "hecho de que el testigo no protestara o hiciera comentarios sobre la identidad del acusado-apelante al presentársele como el hermano al mismo acusado-apelante, no puede inferirse que la identificación hecha por el testigo sea dudosa. La gama de posibilidades de lo que pudo haber pasado es inmensa. Por ejemplo, el testigo de cargo pudo pensar que se trataba de un hermano gemelo del acusado, o simplemente no entendió que fuese el hermano del acusado-apelante, sino el propio acusado-apelante". Sin embargo, ello sería materia de prueba adicional. De igual modo, las circunstancias físicas, personales y de vestimenta del apelante Reyes, tres meses después de los hechos delictivos, y otros detalles, tales como el número de personas, si alguna presente,

148

Por los fundamentos expuestos, *se dictará sentencia que revoque las del Tribunal Superior, Sala de Caguas y se ordenará un nuevo juicio.*

Los Jueces Asociados Señores Díaz Cruz e Irizarry Yunqué concurren en el resultado sin opinión.

en el momento en que se desarrolló el incidente en el cuartel, abonarían a la determinación final sobre credibilidad.