EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico Recurrido | Apelación |
|---|---|
| v. | 2008 TSPR 124 |
| Carmelo Velázquez Colón Peticionario | 174 DPR ____ |

Número del Caso: CC-2003-218

Fecha: 18 julio de 2008

Tribunal de Apelaciones:

Región Judicial Caguas/Humacao/Guayama Panel I

Juez Ponente:

Hon. Carmen A. Pesante Martínez

Abogado de la Parte Peticionaria:

Lcdo. Erasmo Rodríguez Vázquez

Oficina del Procurador General:

Lcda. Zaira Z. Girón Anadón
Procuradora General Auxiliar

Materia: Asesinato 1er grado y otros

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico                    *Certiorari*
        Recurrido

                              CC-2003-218
        v.

Carmelo Velázquez Colón
        Peticionario

Opinión del Tribunal emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 18 de julio de 2008.

> La capacidad de defensa social y represión del crimen en los países democráticos radica en la sabiduría de sus leyes y en la idoneidad de sus funcionarios; jamás en un procedimiento criminal mutilado y opresivo. No es… el momento de ofrecer la justicia como cordero de sacrificio en aras de la paz y la seguridad del pueblo. La gran fuerza de la Ley y de las cortes como espada protectora de la ciudadanía será más respetable cuanto más diáfanos y esclarecidos sean sus métodos de enjuiciamiento. Pueblo v. Dones, 102 D.P.R. 118, 127 (1974).

Las controversias que nos corresponde atender en este caso versan sobre el derecho del acusado a preparar adecuadamente su defensa, específicamente sobre el requisito de divulgación de prueba impugnatoria relativa a la inocencia del acusado o su castigo, lo cual requiere a su vez la entrega oportuna de dicha prueba. Además, tenemos la oportunidad de establecer los criterios aplicables

a una solicitud de nuevo juicio bajo el fundamento de descubrimiento de nueva prueba cuando ésta ha sido suprimida u ocultada por el Ministerio Fiscal.

I

El peticionario, Carmelo Velázquez Colón, por conducto de la representación legal que le fue designada de oficio, solicita que se revoque una Resolución del Tribunal de Apelaciones que confirmó la denegatoria por parte del Tribunal de Primera Instancia de una solicitud de nuevo juicio al amparo de la Regla 192 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R 192.

Dada la complejidad de este caso, nos vemos obligados a reproducir en detalle su desarrollo procesal y fáctico.

Por hechos ocurridos el 3 de agosto de 1995, se le imputó al peticionario el haber incurrido en violación a los artículos 6 y 8 de la Ley de Armas, artículo sobre Asesinato en primer grado y artículo sobre Conspiración, por alegadamente ultimar al señor Rafael Colomba en conjunto con Orlando Ramos Félix y Leopoldo Sanabria Díaz, en adelante los co-acusados. El 21 de diciembre de 1998 la defensa de uno de los co-acusados, Leopoldo Sanabria Díaz, radicó su moción de descubrimiento de prueba al amparo de la Regla 95 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R 95, mediante la cual se le solicitó al tribunal que ordenara al Ministerio Fiscal y a la Policía de Puerto Rico el acceso a información

necesaria para la preparación de su defensa. En lo pertinente a este caso, la defensa solicitó:

> 1. Informes de delito y arresto y cualquier otro informe policiaco suplementario.
> (…)
> 7. Todo informe, papel, documento, anotación, y/o constancia escrita que se haya preparado en la investigación de esta causa por los testigos de cargo y/o por la Policía de Puerto Rico, incluyendo, entre otros:
> > a. Informe de denuncia o delito
> > b. Hoja o tarjeta de querella
> > c. Orden de arresto
> > d. Informe de arresto
> > e. Notas en las libretas particulares de los testigos
> 8. Toda información y evidencia que pueda contradecir al versión de la fiscalía (en todo o parte), las alegaciones del pliego acusatorio (en todo o en parte), los testigos de cargo (en todo o en parte) y/o que pueda impugnar, desacreditar, y/o poner en duda la prueba objetiva, científica, pericial y testimonial del Ministerio Público; y/o que pueda implicar deshonestidad y/o perjurio de todo o parte de la prueba testifical y/o pericial. De existir dudas sobre la naturaleza y alcance de esta información, deberá someterse al Tribunal para que sea este quien determine lo procedente en Derecho.
> (…)
> 11. Nombres completos, direcciones residenciales, de trabajo y postales, de todas las personas entrevistadas en relación con este caso y que no hubiesen sido incluidas como testigos de cargo, y que conozcan prueba o información sobre este caso que sirvan o puedan ayudar a corroborar y/o a impugnar la prueba de cargo y/o a demostrar que se cometió un delito menor al imputado.
> 12. Toda anotación que cualquier miembro de la Policía de Puerto Rico y/o funcionario del Estado haya realizado en relación con toda comunicación, llamada, mensaje, y/o alerta efectuada el día de los hechos que se imputan; específicamente las anotaciones de los retenes y/o encargados del sistema de radiocomunicaciones de la Policía de Puerto Rico en los pueblos jurisdicción de este Tribunal.
> (…)
> 14. Examen y fotocopia de anotaciones en Libro de Querellas y/o Novedades o en cualquier otro libro o documento, de querellas, quejas, llamadas telefónicas, mensajes, avisos, notificaciones, e

informaciones todas realizadas y/o recibidas en relación con esta causa.

(…)

20. Todo acuerdo, ofrecimiento, convenio o información sobre inmunidad, pagos, rebaja de calificación de falta o delito, penalidades, protección, amparo, ayuda, encauzamiento, parcial o trato preferente que se haya hecho por el Estado o sus funcionarios a testigos y/o a personas relacionadas con los testigos, incluyendo al confidente. (Énfasis suplido.)

(…)

23. Copia de todo récord penal, record y/o expediente administrativo y/o expediente disciplinario de los agentes, testigos de cargo.

(…)

28. Se solicita, además, que el Ministerio Fiscal suministre a la Defensa toda información, prueba o evidencia que pueda resultar favorable a la defensa o ayudar a la misma, o pertinente a la inocencia del imputado o al castigo que en su día pueda imponérsele.

(…)

El peticionario solicitó unirse a ésta solicitud de descubrimiento de prueba y añadió el siguiente requerimiento:

Además solicitamos se ordene al Ministerio Público descubrir de qué forma y manera se intervino con la testigo del pueblo, Zoe Díaz Colón. También solicitamos se le ordene indicar qué ofrecimiento o acuerdo, si alguno, se le hizo para que aceptara ser testigo del pueblo y se ordene la entrega de documento firmado por el Ministerio Público y dicha testigo y su representación legal.

El 12 de marzo de 1999 se celebró la vista sobre el Estado procesal del caso. De acuerdo a la minuta de la vista, luego de que se hiciera constar por la defensa todo lo que el Ministerio Fiscal había entregado, la defensa de uno de los co-acusados llamó a la atención del tribunal que faltaban las notas que tomó el agente de la policía que investigó los hechos. Por su parte, la

defensa del peticionario reiteró su petición de los documentos relacionados a las negociaciones existentes entre la testigo Zoe Díaz Colón y la fiscalía. **El fiscal se limitó a negar que a la testigo se le hubiese ofrecido inmunidad.**

El tribunal le concedió 20 días al Ministerio Público para conseguir todo lo solicitado y señaló la Vista Evidenciaria para el 29 de abril del 1999. El 31 de marzo de 1999, el peticionario expresó, mediante moción titulada "Solicitud de Orden", que entre la evidencia que fiscalía le había entregado a través de uno de los co-acusados no se encontraba "el ofrecimiento o acuerdo, si alguno" que se le hiciera a la señora Zoe Díaz Colon para que fuera testigo del Pueblo. El peticionario también adujo que tampoco se le había hecho entrega de la información solicitada referente a contestaciones y notas en las libretas de los agentes sobre su investigación, ni lo concerniente a las…

> …anotaciones en el Libro de Querellas y/o Novedades o en cualquier otro libro o documento, de querellas, quejas, llamadas telefónicas, mensajes, avisos, notificaciones, e informaciones todas realizadas y/o recibidas en relación con esta causa.

De acuerdo a la minuta de la Vista Evidenciaria celebrada el 29 de abril de 1999, el Ministerio Publico indicó que el fiscal Zayas, a quien se le había solicitado la información, se encontraba de turno y no podía comparecer a sala. Además expresó el Ministerio Público que la información requerida por la defensa del

peticionario podía conseguirse a través del agente Francisco Báez, pero que a pesar de haberse hecho gestiones para comunicarse con él en su oficina, informaron que éste se encontraba fuera de San Juan. El Ministerio Público solicitó copia de la "Solicitud de Orden" de la defensa para iniciar los trámites ese mismo día y pidió una prórroga de cinco días a los fines de contactar al agente Báez y proveer la información solicitada. El tribunal concedió cinco días improrrogables para que se suministrara la información pedida.

El 6 de mayo de 1999 se celebró la vista de seguimiento. En la minuta se hizo constar que la defensa del peticionario reiteró su petición de prueba. Ese día, el Ministerio Público informó que por razón de que el fiscal Zayas estaba enfermo no se pudo completar la orden del tribunal, pero que se ponían a la disposición de la defensa los agentes Jesús Figueroa y Francisco Báez para que consiguieran la información que faltaba. Éstos expresaron que ese mismo día harían las gestiones para obtener lo requerido. **El Ministerio Fiscal nuevamente reiteró que no se había firmado ningún acuerdo de inmunidad con la testigo.** Así las cosas, se señaló la fecha para el juicio por tribunal de derecho.

El primer día del juicio, la defensa reiteró una moción urgente de suspensión que le habían hecho al tribunal, la cual fue denegada. Al concedérsele un tiempo

para argumentar a favor de la suspensión, la defensa insistió en que aún faltaba prueba por descubrir, entre la cual se encontraban los informes policíacos de los agentes que investigaron los hechos delictivos. **En ese momento, el Ministerio Público informó que apareció una documentación que se había perdido y que se había comenzado a fotocopiar para entregarla a la defensa.** Dicha información resultó ser el informe policiaco del agente Dones; el informe policial de persona muerta y las notas del Agente Figueroa. A éste último se le había preguntado al respecto de esas notas cuando se le puso como testigo a la disposición de la defensa durante las vistas evidenciarias y tanto él, como el agente Báez informaron que las conseguirían. A pesar de ello, nunca aparecieron hasta el primer día del juicio. **Estos documentos contenían los nombres de testigos que fueron entrevistados por los agentes del orden público y cuyas declaraciones contradecían la declaración jurada y el testimonio de la testigo principal de la fiscalía, la Sra. Zoe Díaz Colón.**[1] No se le concedió el tiempo a la

---

[1] La declaración prestada por Zoe Díaz Colón lee así:

    [P.] [¿] Qué usted me puede decir sobre unos hechos ocurridos el día 3 de agosto de 1995 en Salinas, Puerto Rico?

    R. Que yo me encontraba en el Pueblito del Carmen en el negocio frente al parque, y estaban Orlando Ramos Félix (quien era mi esposo), Rosty [Carmelo Velázquez Colón] y Chaca [Leopoldo Sanabria Díaz], y Orlando hizo el comentario que ellos querían tumbar a Colomba quien iba mucho al negocio, lo querían tumbar por $300.00, y Orlando dijo que el día 3 que cogía el Seguro Social Colomba lo iba a tumbar para tumbarle los chavos, esto fue el 29

antes de la muerte, luego el día 3 de agosto de 1995, yo estaba en el Bo. La Plena donde yo vivo y ellos hacían horas que estaban dando vueltas en un 5 litros color rojo, este carro supuestamente era de la que era novia de Orlando, y entonces ese mismo día Colomba fue y le pagó unos chavos al señor Ángel Rivera, quien vende comidas, carnes, cervezas, y estuvo mucho rato bebiendo en el negocio y entonces vino mi amigo y yo que andaba con tres amigas mías, nos fuimos a pasear por La Plena, Cimarrona, subimos por Guayama, pasamos por un puente y llegamos al Pueblito del Carmen a jugar billar frente del parque, ahí estuvimos un buen rato de [sic] las 5:00 p.m. hasta las 8:30 p.m., y de ahí le dije al amigo mió que nos fuéramos para La Plena y cuando veníamos bajando de allá arriba del Pueblito del Carmen después de las 8:30 p.m., que íbamos llegando a un [sic.] curva casi a la casa de Columba [sic.], mi amigo puso la luz larga y yo le dije a él, aquí pasó algo, y cuando mi amigo alumbró bien la luz, veo a Orlando a [sic.] Chaca que se montan en el carro cinco litros y Rusty está montado en la parte de atrás del carro, Orlando se montó en lado del guía, cuando orlando se fue a montar al carro yo le v un revólver en la mano y ahí se montó Orlando en el carro, y ellos arrancaron, huyeron, y yo le dije a mi amigo que se parara y cuando nos bajamos vi a Colomba muerto en el piso y el carro estaba de la [sic.] lado y la puerta del conductor estaba abierta y por ahí nosotros cogimos y nos montamos y no dijimos na [sic.] y seguimos por ahí pa' bajo [sic.] y llegamos al negocio de Judith que queda al lado del Albergue Olímpico y ahí estaban Rusty, Chaca y Orlando jugando billar y fui y le pregunté a Orlando por lo nenes míos y ellos se veían como azorados.

P. ¿Algo más que declarar?

R. Sí, que yo supe que luego de la muerte de Colomba al amanecer se fue Rusty para allá afuera y estuvo como dos semanas afuera y cuando regresó, me vio en casa de Judith y me haló pa' fue [sic.] y me amenazó que si yo hablo del caso de Colomba, que me iba a matar. También quiero decir que el arma era negro despintaou [sic.], las tapitas eran negras, el cañón era corto.

Nota: Se hace constar que esta declaración fue leída por el agente Francisco Baez Quiñones, ya que la declarante no sabe leer.

(…)

En el expediente policiaco entregado el primer día del juicio, se hacen constar los nombres de diferentes testigos, algunos entrevistados por los agentes, que ubican al occiso vivo y acompañado de otras personas,

defensa para estudiar dicho expediente y se procedió con la celebración del juicio en su fondo.

Durante el juicio, la prueba del Estado consistió en la declaración de los agentes investigadores de la Policía de Puerto Rico y en el testimonio de Zoe Díaz Colón.

El primer testigo, el Sr. Hilario Garriga Bank declaró que en la noche de los hechos se encontraba dando rondas preventivas cuando recibió una llamada de una señora que le informó que había una persona tirada en la orilla de la carretera, cerca de un vehiculo azul, que aparentaba estar muerta. Este agente fue quien primero se personó al lugar de los hechos, describió al occiso e indicó que presentaba varios impactos de bala en el abdomen.

El Teniente Osvaldo Cartagena fue agente de servicios técnicos del Cuerpo de Investigaciones Criminales (C.I.C.) de Guayama para la época de los hechos y expuso que **de acuerdo a un examen efectuado, las huellas dactilares encontradas en el vehículo del occiso no resultaron ser las de los co-acusados.**

El Sr. Aníbal Soliván Soliván declaró ser el Director del C.I.C. de Guayama e indicó que la noche de los hechos cubrió la escena junto al agente Cartagena. Su testimonio giró en torno a las fotos que se tomaron

---

horas más tarde de lo que dice la única testigo del Estado.

del lugar de los hechos y a la descripción del lugar donde se halló el cadáver.

El Sr. Figueroa Cruz manifestó que fue agente investigador del caso a partir del 11 de junio de 1993. Declaró que entrevistó a Zoe Díaz Colón y que como resultado de esa entrevista, interrogó al agente Dones y al sargento Daniel Colón y que el 2 de julio del 1998 se sometieron denuncias en ausencia contra los co-acusados.

Por su parte, el Sr. Héctor Dones declaró que el caso le fue asignado el 4 de agosto de 1995 y que estuvo encargado de investigar el área para buscar evidencia.

Por último, Zoe Díaz Colón declaró que el 29 de julio de 1995 el peticionario y los co-acusados estaban planeando matar a Colomba por trescientos dólares ($300), cosa que efectuaron el 3 de agosto del mismo año. Explicó que ella se encontraba el día de los hechos en el Barrio La Plena de Salinas con dos personas más, y que a eso de las 5:30 p.m. se dirigió en automóvil hacia el Pueblo del Carmen, en donde jugó billar en un local frente al parque.[2] Aproximadamente a las 8:00 p.m. se dirigían de vuelta hacia el Barrio La Plena cuando vio el carro de Colomba, al lado vio a Orlando Ramos Félix con un revolver, Leopoldo Sanabria Díaz estaba al lado,

---

[2] Como alega el peticionario, estas personas que la acompañaban y que alegadamente presenciaron con Zoe Díaz Colón la huída del peticionario y los co acusados y que vieron al occiso, nunca fueron entrevistados por los agentes investigadores, nunca formaron parte de la prueba de cargo, y nunca aparecieron a pesar de las gestiones que efectuara la defensa.

Carmelo Velázquez detrás. Alegó Díaz Colón que cuando Ramos Félix la ve, se montan los tres en un carro. Ramos Félix iba guiando. La testigo explicó que los tres co-acusados se dirigieron al "negocio en casa de Judith". La testigo, que se dirigía al mismo lugar, llegó al negocio de Judith y habló con Ramos Félix, quien lucía bien asustado. Declaró que los tres co-acusados se encontraban allí jugando billar, y que a pesar de que el cuartel de la Policía se encuentra entre la casa de Colomba y el negocio de Judith, ella no se detuvo.

De acuerdo a la prueba presentada por el Estado, y luego de divulgado su testimonio en sala, Zoe Díaz Colón fue la única testigo que colocó a los acusados en la escena del crimen y que los identificó como los perpetradores. La defensa trató de impugnar el testimonio de ésta testigo con las múltiples inconsistencias entre su testimonio en sala, el testimonio ofrecido en la Vista Preliminar y su declaración jurada y con el testimonio ofrecido por ella en otros procesos criminales en los que fungió como testigo principal de cargo, ello con el propósito de establecer que era un testimonio estereotipado que merecía ser evaluado con sospecha.

Antes de recaer sentencia, el 22 de septiembre de 1999, el peticionario radicó una moción de nuevo juicio al amparo de la Regla 188, de Procedimiento Criminal, 34 L.P.R.A. Ap. II, basada, entre otras cosas en el hecho de que el Ministerio Fiscal entregó el primer día del juicio

prueba que existía y era pertinente para impugnar la prueba del Estado y por ende, necesaria para la preparación adecuada del caso de la defensa. Tomando en consideración el tiempo que había transcurrido entre los hechos y el juicio (cuatro años); la localización del lugar de los hechos en barrios de las zonas montañosas; el contenido de la evidencia; el hecho de que las notas de los agentes estaban en manuscrito, contenían frases incompletas y que en ellos se identificaba a los testigos entrevistados por su apodo o primer nombre, el acusado sostuvo que el momento de la entrega fue inoportuna e impidió la adecuada preparación de su defensa. Muestra de ello fue que no se pudo dar con varios de estos testigos hasta después del juicio; algunos no estaban disponibles o vivían en el extranjero y a otros ni tan siquiera se les pudo identificar. El peticionario describió adecuadamente las diligencias que tuvo que llevar a cabo para tratar de localizar a los potenciales testigos que surgían de los expedientes policiales.

El mismo día en que decretó la Sentencia atribuyendo al peticionario y co-acusados la comisión de los delitos imputados, el Tribunal de Primera Instancia emitió una Resolución oral declarando no ha lugar la mencionada moción de nuevo juicio. Ésta Resolución luego se incluyó en la Resolución que declaró no ha lugar la Moción de Reconsideración que radicó el acusado contra la sentencia dictaminada. El Tribunal de Primera Instancia fundamentó

su dictamen en el hecho de que se había celebrado una vista de estado procesal el 6 de mayo de 1999, y que en la misma, la defensa había anunciado que "la Regla 95 estaba completa".

El peticionario acudió oportunamente al Tribunal de Apelaciones. Como error, reiteró lo planteado en la moción de nuevo juicio acerca de que se celebró el juicio a pesar de que no pudo descubrir oportunamente y debido a la falta de diligencia del Estado, evidencia que impugnaba la del Ministerio Público, ello en contravención al debido proceso de ley. El Tribunal de Apelaciones se concentró en los intentos del peticionario por impugnar a la testigo Zoe Díaz Colón con declaraciones juradas vertidas en otros procedimientos criminales ajenos al caso de autos. Dicho foro confirmó al de Primera Instancia bajo el fundamento de deferencia a la apreciación de la prueba que hiciera el foro inferior.

El peticionario acudió ante nos el 4 de junio del 2001 mediante el recurso CC-2001-449. Nuevamente incluyó como uno de los errores que cometió el foro apelativo, el que se celebrara el juicio sin darle la oportunidad de investigar y descubrir efectivamente la prueba que le fue entregada el primer día del juicio. Mediante Resolución del 6 de julio del 2001, declaramos No Ha Lugar su solicitud de *Certiorari*.

El 9 de julio del 2001, el peticionario radicó, ante el Tribunal de Primera Instancia, otra moción de nuevo juicio, esta vez bajo la Regla 192 de Procedimiento Criminal, supra, amparándose tanto en los fundamentos planteados en su solicitud de nuevo juicio radicada bajo la Regla 188, supra, como en otros que se incluyen por primera vez como nueva prueba.

De acuerdo a sus alegaciones, el 5 de mayo del 2001, Zoe Díaz Colón prestó una declaración jurada ante el abogado de uno de los acusados en otro caso criminal en el que ella también fue testigo. Mediante esta nueva declaración desmintió el testimonio que había prestado en tres casos distintos, incluyendo el caso de la muerte de Colomba, que fue atribuida al peticionario y a los co-acusados. La testigo expresó que no tenía conocimiento personal de las muertes y que testificó porque le ofrecieron una casa, dinero en efectivo y la custodia de los hijos que procreó con uno de los co-acusados del caso de autos, Orlando Ramos Félix. La madre de éste tenía la custodia temporera de los menores. Mencionó que se había enterado recientemente del suicidio en prisión de una persona que resultó convicta en uno de los casos en los que ella testificó, cosa que le hizo sentir sumamente culpable, al punto en que intentó suicidarse en el Albergue de Testigos y Víctimas. Además, expresó en su declaración jurada que la madre de su compadre asesinado y el agente Francisco Báez la habían presionado. Díaz

Colón explicó que luego de diez (10) sesiones en las que los agentes le enseñaban fotos de los acusados y la llevaban al lugar de los hechos, se aprendió las declaraciones que debía dar y que finalmente ofreció en fiscalía.

En su moción de nuevo juicio, el peticionario alegó entre otras cosas, que a pesar de las solicitudes para descubrir prueba favorable y de impugnación con respecto a la testigo principal de fiscalía, no es hasta que Zoe Díaz Colón se retracta de su testimonio original mediante su declaración del 5 de mayo del 2001 que surge el hecho de que ella era confidente retribuida de la Policía de Puerto Rico desde antes de la ocurrencia de los hechos imputados al peticionario.

De acuerdo a la evidencia sometida como parte de la moción de nuevo juicio, Zoe Díaz Colón firmó un contrato para prestar servicios como cooperadora retribuida el 2 de agosto de 1995. Los hechos imputados al peticionario ocurrieron el 3 de agosto de 1995. No obstante, la testigo prestó su declaración jurada sobre la muerte de Colomba casi tres años después, el 11 de junio de 1998. Ese mismo día también prestó otra declaración jurada en la que alegó tener conocimiento personal del asesinato de su compadre, ocurrido el 2 de noviembre de 1997. Ambas declaraciones fueron prestadas entre las 4:00 p.m. y 6:00 p.m. de ese día. Esa tarde, se le entregaron doscientos dólares ($200.00) como remuneración por información

prestada en el caso de la muerte de otra persona. El pago efectuado en concepto de retribución por la información para esclarecer el asesinato que se le atribuye al peticionario se hizo el 10 de marzo de 1999; el recibo se adjuntó a la moción de nuevo juicio. De acuerdo al peticionario, esta prueba era necesaria para la debida impugnación de la única testigo del Estado que lo vinculó al delito.

Los co-acusados en el caso de la muerte de Colomba también presentaron mociones de nuevo juicio. A solicitud del Ministerio Fiscal, se consolidaron éstas mociones de nuevo juicio con las de los co-acusados en el caso de la muerte de Peña, el compadre de Zoe Díaz Colón. La consolidación se debió a que el fundamento principal, aunque no exclusivo, de los acusados era el retracto de quien fuera la testigo principal del Estado en ambos procesos penales. La representación legal del peticionario se opuso a la consolidación, pero el tribunal no accedió a su solicitud.

El Tribunal de Primera Instancia celebró vistas para dilucidar los planteamientos del peticionario y los demás acusados en ambos casos. Durante el desfile de prueba, el peticionario manifestó en varias ocasiones que fue durante este proceso de nuevo juicio que finalmente obtuvo acceso al contrato de confidente de la testigo Zoe Díaz Colón y que además, el primer día del juicio fue que se le entregó evidencia que de haber sido entregada

oportunamente, hubiese servido para impugnar la del Ministerio Fiscal.[3]

**Durante esta vista de nuevo juicio, uno de los testigos, el Sr. Orlando Rodríguez Almedina** declaró haber sido uno de los oficiales pagadores encargados de emitir los pagos a los confidentes para la época en que ocurrieron los hechos. Como parte de las aseveraciones que hizo, **aceptó que para el caso de la muerte de Colomba, fiscalía le había requerido copia del contrato de confidente de Zoe Díaz Colón porque le habían solicitado a fiscalía dicho documento, no obstante, el testigo aceptó que a la primera persona a quien entregó copia del contrato fue al fiscal que representó al Pueblo en otro caso donde Zoe Díaz Colón fue testigo.**

**Por su parte, el agente Francisco Báez testificó en la vista de nuevo juicio que los expedientes policíacos**

---

[3] Como parte de la prueba presentada durante las vistas de nuevo juicio, el acusado presentó declaraciones juradas de los testigos que pudo conseguir de entre los que se encontraban en el expediente policiaco por haber sido entrevistados por el agente de la policía. A pesar de las diligencias del acusado para conseguir su testimonio, Myrna Mendoza Bristol y Leonardo Arias Reyes, no estuvieron disponibles durante el juicio por estar fuera de Puerto Rico. En sus declaraciones, testificaron haber ayudado al occiso a reparar su vehículo averiado durante el tiempo en que Zoe Díaz Colón alegó haber visto a los co-acusados en el lugar de los hechos. Carlos Pomales Pomales resultó ser, para la época de los hechos, el arrendatario del negocio en donde Zoe Díaz Colón alegadamente escuchó la planificación del crimen. Este señor declaró que el occiso había visitado su negocio en varias ocasiones, incluyendo el día de cobro del seguro social, pero Zoe Díaz Colón nunca había estado allí. Para el juicio, el acusado sólo contó con el testimonio del dueño del negocio, el nombre del arrendatario surgió del expediente del agente investigador.

**siempre estuvieron disponibles en el C.I.C. y que contrario a lo que le informaron a la defensa y al tribunal el primer día del juicio, nunca estuvieron perdidos. El fiscal Ulpiano Crespo Armenteros aceptó haber dicho el primer día del juicio que dicho expediente estaba perdido pero que había aparecido.**

A pesar de que el peticionario demostró que la prueba que solicitó desde la etapa del descubrimiento de prueba no se divulgó por falta de diligencia estatal, y no obstante el hecho de que **durante la vista de nuevo juicio el Tribunal del Primera Instancia reconoció que el peticionario no tuvo el tiempo suficiente para evaluar los expedientes policíacos**, dicho foro se limitó a evaluar la petición de nuevo juicio a la luz del retracto del testimonio de Zoe Díaz Colón y de toda la prueba presentada por la defensa de todos los acusados y por fiscalía en torno a este punto.[4] Aún cuando el peticionario aclaró en varias ocasiones que había prueba que no debía tomarse en consideración para su petición de nuevo juicio, el tribunal resolvió las mociones en conjunto y sin hacer determinaciones particularizadas.

El tribunal aplicó los requisitos que se han establecido jurisprudencialmente para evaluar las solicitudes de nuevo juicio fundamentadas en el descubrimiento de nueva prueba, luego de lo cual denegó la moción de nuevo juicio del peticionario y de los co-

---

[4] Pueblo v. Chévere Heredia, supra.

acusados. El tribunal concluyó que la prueba no se pudo haber descubierto con razonable diligencia antes del juicio y que no era meramente acumulativa. En cuanto a si era prueba impugnatoria, el tribunal señaló que al retractarse de su testimonio original y al ser la única testigo de cargo, su nueva declaración jurada iba dirigida a sembrar dudas sobre la confiabilidad de su testimonio original, al punto que de ser creída, sería prueba totalmente exculpatoria. A pesar de esto, el Tribunal de Primera Instancia concluyó que el testimonio de la testigo Zoe Díaz Colón, no era creíble y que no derrotó la prueba que estableció la culpabilidad del peticionario y de los co-acusados en el juicio original.

Tras solicitar reconsideración, el acusado acudió al Tribunal de Apelaciones. Allí cuestionó, entre otras cosas, que el Tribunal de Primera Instancia no tomara en consideración sus planteamientos sobre el contrato de confidente de Zoe Díaz a pesar de que la fiscalía tiene la obligación de revelar prueba relativa a la inocencia del acusado. El Tribunal de Apelaciones también hizo caso omiso de los planteamientos particulares del peticionario, y al resolver los recursos consolidados de todos los acusados, determinó que no habían cumplido con lo dispuesto en Pueblo v. Marcano Parrilla I, 152 D.P.R. 557 (2000), donde se estableció el estándar que para entonces aplicaba a las solicitudes de nuevo juicio basados en nueva prueba después de emitida la sentencia y

en Pueblo v. Chévere Heredia, 139 D.P.R. 1 (1995), que trata sobre el retracto de un testimonio y su efecto a nivel de nuevo juicio.

Particularmente, en cuanto a los requisitos del nuevo juicio, el tribunal apelativo concluyó que las contradicciones de Zoe Díaz Colón, las alegaciones sobre las amenazas bajo las cuales testificó, la prueba sobre sus capacidades mentales y carácter mendaz, y los testimonios de los testigos que se encontraban en el expediente policiaco que se le entregó al peticionario el primer día del juicio, constituyen prueba que pudo razonablemente conseguirse durante el juicio. El tribunal también señaló que la prueba de los acusados, a pesar de no ser acumulativa, iba dirigida a impugnar toda la prueba presentada en el juicio. El Tribunal de Apelaciones sostuvo en su Sentencia que parte de la prueba presentada resultó creíble, pero que no hubiese variado el fallo de culpabilidad de haberse presentado en el juicio al no establecer claramente la inocencia de los convictos al punto de que su encarcelación ofenda el sentido de la justicia.

El Tribunal de Apelaciones concluyó además que la moción de nuevo juicio va dirigida a la discreción del tribunal sentenciador, por lo que denegada esta moción por el foro de primera instancia, un tribunal apelativo no intervendrá con dicha determinación a menos que se muestre un claro e inequívoco abuso de discreción. Esto

de acuerdo a lo resuelto en <u>Pueblo v. Chévere Heredia</u>, supra, <u>Pueblo v. Morales Rivera</u>, 115 D.P.R. 107 (1984) y <u>Pueblo v. Prieto Maysonet</u>, 103 D.P.R. 102 (1974).

Al ser denegada su solicitud de reconsideración por el foro apelativo, el peticionario acudió ante nosotros. Mediante Resolución denegamos su recurso de Certiorari. Al presentarse una solicitud de reconsideración, y a los fines de evaluar la misma, solicitamos la transcripción de la vista de nuevo juicio y toda la evidencia documental allí presentada. Finalmente, expedimos el auto de Certiorari. Con la comparecencia de ambas partes, procedemos a atender el recurso.

Para justificar su petición, y entre otros planteamientos, el peticionario alude a la admisión que hizo el agente Francisco Báez en las vistas sobre nuevo juicio en cuanto a que el expediente de investigación de la policía estuvo siempre disponible en el C.I.C. También apunta a lo expresado por el testigo Orlando Rodríguez Almedina, quien aceptó que el Ministerio Público le solicitó el contrato de confidente de Zoe Díaz Colón en el caso de la muerte de Colomba porque se lo habían pedido a fiscalía. No obstante, nunca se le entregó a la defensa. En torno a este punto, el peticionario también argumenta que aún cuando el agente Francisco Báez sabía, desde el 1998, que Zoe Díaz Colón era confidente, lo ocultó en las vistas evidenciarias que

precedieron el juicio.[5] Resalta el peticionario que ambos foros judiciales ignoraron estos planteamientos al adjudicar la moción de nuevo juicio. Por estas razones, y contrario a lo que concluyó el Tribunal de Apelaciones, el peticionario arguye que no se le puede imputar a la defensa el que no se pudiera usar durante el juicio la evidencia contenida en el expediente policiaco. En su recurso nos solicita que tomemos en consideración, entre otros asuntos, lo resuelto en Brady v. Maryland, 373 U.S. 83 (1963); Pueblo v. Ortiz Vega, 149 D.P.R. 363 (1999); Pueblo v. Torres Rivera, 129 D.P.R. 331 (1991); Pueblo v. Hernández García, 102 D.P.R. 506 (1974) y Pueblo v. Rodríguez Sánchez, 109 D.P.R. 243 (1979).

Las controversias que nos corresponde atender en este caso versan sobre el derecho del acusado a preparar adecuadamente su defensa, lo cual requiere tanto la divulgación de prueba impugnatoria relativa a su inocencia o castigo, como su entrega oportuna al acusado. Ambas garantías están cimentadas en consideraciones jurídicas que trascienden el ámbito estatutario, pues su razón de ser radica en la base misma del derecho de todo acusado a gozar de un debido proceso de ley contenido en la séptima sección de nuestra Carta de Derechos y en el derecho plasmado en la undécima sección del mismo

---

[5] El peticionario señala además que no fue hasta el primer día del juicio que se le informó a la defensa que se habían examinado las huellas digitales en el carro del occiso, a pesar de que esta información también se había solicitado durante la etapa de descubrimiento de prueba.

documento constitucional que garantiza a todo acusado de delito público un juicio justo e imparcial en el cual pueda carearse con la prueba del Estado.[6] La divulgación de prueba impugnatoria relativa a la inocencia o castigo del acusado, así como su entrega oportuna son esenciales salvaguardas contra las acciones arbitrarias del Estado en situaciones en las que está en juego uno de los más preciados valores de una sociedad democrática, la libertad.

Además, esta controversia nos presenta una oportunidad para establecer la relación entre la Regla 192 de Procedimiento Criminal y la concesión de nuevo juicio por descubrimiento de nueva prueba de impugnación cuando ésta es de carácter exculpatorio y el Ministerio Público dejó de divulgarla.

I

Cuando el Estado lesiona el debido proceso de ley de un acusado mediante la supresión u omisión de evidencia que incide sobre asuntos de inocencia o culpabilidad, el remedio que procede es la concesión de un nuevo juicio. En Pueblo v. Hernández Santana, 138 D.P.R. 577 (1995) resolvimos que ante "la situación grave y perjudicial", en que el Ministerio Fiscal "esconde" o no descubre prueba que demuestra, o tiende a demostrar, la inocencia

---

[6] Ya dijo un conocido autor que una de las características de un gobierno tirano es la ausencia del derecho de una persona a enfrentar, con una defensa efectiva, un proceso criminal celebrado en su contra. Edward J. Imwinkelried, Exculpatory Evidence, 3ra ed., San Francisco, Lexis Nexis, 2004, pág. 1.

del acusado, lo que procede es revocar la convicción y ordenar la celebración de un nuevo juicio. Como dijimos en este caso, esa es la regla mayoritaria, tanto en nuestra jurisdicción, como en la esfera federal. Véanse además Pueblo v. Morales Rivera, 115 D.P.R. 107, 109-110 (1984); Pueblo v. Torres Rivera, 129 D.P.R. 331 (1991).

Establecido lo anterior, debemos señalar como cuestión de umbral, cuál es el estándar que aplica a una moción de nuevo juicio como la instada en el caso de autos.

De acuerdo a nuestro ordenamiento estatutario, la moción de nuevo juicio que permite la Regla 192 de Procedimiento Criminal, supra, procede cuando el acusado adviene en conocimiento de nueva prueba luego de que se haya dictado sentencia. El caso de Pueblo v. Marcano Parrilla II, 2006 TSPR 136, estableció el nuevo criterio que debe utilizarse para determinar si procede ese remedio.

Allí, tras estudiar los antecedentes legales de la figura contenida en nuestra Regla 192, supra, entendimos procedente analizar esta moción de nuevo juicio a la luz de la moción de nuevo juicio codificada en la Regla 33 de Procedimiento Criminal Federal. En atención a dicha Regla, la doctrina federal señala unos requisitos que el promovente debe cumplir para que proceda el nuevo juicio solicitado. Estos requisitos son: que la prueba se haya descubierto después del juicio; que no pudo ser

descubierta antes a pesar de haber mediado diligencia; que la nueva prueba es pertinente a la controversia y no meramente acumulativa o de impugnación. Además, la nueva prueba presentada en apoyo a la moción debe hacer probable un resultado distinto si se concediera el nuevo juicio. Estos criterios componen la doctrina llamada "Berry Rule" y aplican en Puerto Rico, tanto a la moción de nuevo juicio bajo la Regla 188 de Procedimiento Criminal, como a la Regla 192, supra. Pueblo v. Chévere Heredia, 139 D.P.R. 1 (1995); Pueblo v. Marcano Parrilla II, supra.[7]

Distinto a nuestro ordenamiento, en la jurisdicción federal sólo existe una Regla unitaria de nuevo juicio que aplica antes y después de dictada la sentencia. Tomando en consideración este hecho, resolvimos en Pueblo v. Marcano Parilla II, supra, que la Regla 192, supra, debía ser de naturaleza excepcional, pues su propósito es la revocación de sentencias finales y firmes avaladas por una presunción de legalidad y corrección. En resumidas cuentas, una moción de nuevo juicio basada en nueva prueba y solicitada en virtud de la Regla 192, supra, procede si…

> …analizando la nueva evidencia junto a la presentada en el juicio original de la forma más favorable al fallo o veredicto de culpabilidad que se impugna, la misma pudo

---

[7] Para un excelente acopio de la jurisprudencia que ha establecido estos criterios en Puerto Rico, véanse Pueblo v. Rivera Lugo y Almodóvar, 121 D.P.R 476 (1988) y Pueblo v. Morales, 66 D.P.R. 10 (1946).

haber creado duda razonable en el ánimo del juzgador, en cuanto a la culpabilidad del peticionario. Esto es, la nueva prueba debe demostrar que es más probable que el convicto sea inocente a que sea culpable. Pueblo v. Marcano Parilla, supra, pág.

No obstante lo anterior, la trayectoria jurisprudencial, tanto en Puerto Rico como en Estados Unidos, ha tomado otro curso cuando la nueva prueba que sustenta la solicitud de nuevo juicio fue ocultada o suprimida por el Estado.

En la jurisdicción federal, las mociones "ordinarias" de nuevo juicio basadas en el descubrimiento de nueva prueba solicitadas al amparo de la Regla 33 de Procedimiento Criminal Federal, son evaluadas bajo el "Berry Rule". No así cuando se suprime o se deja de divulgar prueba favorable a la defensa; en esos casos se aplica un estándar más relajado.

De acuerdo al Tribunal Supremo de Estados Unidos, si el estándar aplicado a las mociones "ordinarias" de nuevo juicio fuera el mismo cuando la nueva prueba estuvo en manos del Estado que cuando la evidencia provenga de fuentes neutrales, no sería particularmente significante la obligación que tiene el ministerio fiscal de servirle a la causa de la justicia. U.S. v. Agurs, 427 U.S. 97, 111 (1976). Véase además Wright, King & Klein, Federal Practice and Procedure, Thomson, West, Vol. 3, 2004, sec. 557, págs. 542-543 y sec. 557.2, págs. 588-589. Los criterios que se utilizan en situaciones donde la negligencia del Estado es la causante de la solicitud de

nuevo juicio bajo el fundamento de nueva prueba son los establecidos en Brady v. Maryland, supra, y su posterior desarrollo jurisprudencial.

En Puerto Rico, en el caso de Pueblo v. Torres Rivera, 129 D.P.R. 331 (1991), resolvimos mediante sentencia una moción de nuevo juicio bajo la Regla 192, basada en la omisión del Ministerio Público de revelar prueba que impugnaba la de cargo. Allí, tras citar los requisitos de una moción de nuevo juicio, resolvimos que…

> …para examinar un reclamo de nueva prueba de carácter impugnatorio de la prueba producida en el juicio… debemos aplicar los criterios esbozados en Giglio y Bagley. Ello, ya que, aun cuando la alegada nueva prueba va dirigida a impugnar la prueba de cargo aducida en el juicio, implica el derecho del acusado a un juicio justo en donde se le garantice el debido proceso de ley frente a la conducta del representante del Estado. Pueblo v. Hernández García, págs. 510-511.

De igual manera, nuestra decisión en Pueblo v. Hernández Santana, supra, estuvo fundamentada en el caso de Brady v. Maryland, supra, y su progenie. Al resolver que la prueba suprimida cumplía con la casuística federal aplicada, concedimos un nuevo juicio. Véase además Pueblo v. Morales Rivera, 115 D.P.R. 107, 109-110 (1984).

Es decir, cuando el Estado ha ocultado prueba exculpatoria, la moción de nuevo juicio que procede no puede ser evaluada a la luz de los requisitos estatutarios y jurisprudenciales aplicables a las mociones "ordinarias" de nuevo juicio, pues los derechos lacerados con la omisión del Estado están protegidos por

consideraciones mucho más abarcadoras que las Reglas de Procedimiento Criminal, a saber, el derecho a un debido proceso de ley, el derecho a obtener evidencia favorable y el derecho a enfrentar la prueba del Estado. Pueblo v. Arzuaga Rivera, 160 D.P.R. 520 (2003).

A continuación discutiremos la jurisprudencia federal y puertorriqueña que ha establecido el criterio aplicable cuando por negligencia del Estado el acusado no descubre prueba relativa a su inocencia o castigo.

II

Al adentrarnos en el tema sobre las obligaciones del ministerio fiscal hacia la defensa del acusado en torno a prueba relativa a inocencia o castigo, partimos del caso de Napue v. State of Illinois, 360 U.S. 264 (1959). En este caso, un testigo esencial de cargo, a preguntas de la defensa, mintió sobre el hecho de que le habían prometido una reducción en su sentencia a cambio de su testimonio; el fiscal no lo desmintió. El Tribunal Supremo de Estados Unidos resolvió que el juicio había sido maculado e injusto, a pesar de que la defensa había presentado durante el juicio prueba adicional para impugnar a este testigo en cuanto a su parcialidad. De esta manera, comenzó a ampliarse el derecho de acceso a prueba exculpatoria, al incluir en su ámbito prueba relativa a la credibilidad de los testigos.

Pocos años después, en Brady v. Maryland, supra, el Tribunal Supremo de los Estados Unidos resolvió que se

lacera el debido proceso de ley de un acusado cuando la fiscalía suprime, ya sea de buena o de mala fe, prueba favorable al acusado que la defensa ha solicitado como parte de su descubrimiento de prueba y que sea pertinente en cuanto a la culpabilidad o al castigo del acusado. El Tribunal declaró que una fiscalía que suprime prueba exculpatoria aporta a la formación de un sistema acusatorio que impone una carga impermisible a los acusados. Además, el Tribunal concluyó que era imposible ponerse en el lugar del juzgador de hechos y asumir la adjudicación de credibilidad y de valor probatorio que éste hubiese efectuado de tener ante sí la prueba suprimida.

Posteriormente y siguiendo este raciocinio, en Giglio v. United States, 405 U.S. 150 (1972), el Tribunal dictó la norma que establece que cuando la fiabilidad en un testigo sea un factor determinante para propósitos de establecer la inocencia o culpabilidad de un acusado, la supresión de evidencia impugnatoria cae dentro de la regla de Brady eliminándose así la distinción entre prueba impugnatoria y prueba exculpatoria. De manera que la supresión de prueba de impugnación de un testigo esencial del Estado, al ser considerada evidencia pertinente en cuanto a la inocencia o culpabilidad del acusado, amerita un nuevo juicio. De acuerdo a esta norma jurisprudencial, cuando el caso en contra de un acusado dependa casi enteramente en el testimonio de un testigo

con el cual la fiscalía haya hecho un acuerdo, la credibilidad de este testigo es un asunto importante, y cualquier acuerdo entre la fiscalía y el testigo es pertinente para impugnar la credibilidad de su testimonio.

En U.S. v. Bagley, 473 U.S. 667 (1985), el Tribunal Supremo de Estados Unidos delimitó el alcance de la doctrina de Giglio y aclaró el estándar de pertinencia (*materiality*) aplicable para conceder un nuevo juicio en el contexto de prueba exculpatoria omitida. De acuerdo a los hechos de este caso, durante la etapa del descubrimiento de prueba el acusado había solicitado expresamente que se revelara cualquier promesa o incentivo que se hubiera ofrecido a los testigos principales del Estado, quienes habían intervenido en el caso como agentes encubiertos. Luego de recaída la sentencia, el acusado advino en conocimiento de unos contratos que establecían un pago contingente por la información que suministraban los encubiertos.

El Tribunal Supremo indicó que la doctrina establecida en Brady está cimentada en el debido proceso de ley, y que su propósito no fue reemplazar el sistema adversativo como el modo primario de descubrir la verdad, sino el de evitar un fracaso de la justicia[8]. En este

---

[8] El Tribunal expresa que el rol del fiscal trasciende el de un adversario, pues no es el representante legal de una parte ordinaria, sino de una soberanía cuyo interés en el ámbito penal no es ganar un caso, sino que se haga justicia. Id. pág. 675, escolio 6.

sentido, la doctrina no pretende que la defensa efectúe una expedición de pesca en el expediente de la fiscalía, sino que se divulgue aquella prueba que sea favorable al acusado, es decir, prueba sin la cual no es posible un juicio justo.  Id. pág. 675.

También en Bagley, el Tribunal señaló que aunque el caso de Brady trataba sobre la omisión de prueba exculpatoria, la prueba de impugnación que se pretenda utilizar para mostrar parcialidad o interés de los testigos del gobierno cae también bajo la llamada "regla de Brady" por constituir prueba exculpatoria de acuerdo a los estándares de los casos mencionados. Ello así pues de ser revelada y efectivamente utilizada por la defensa, esa prueba puede hacer la diferencia entre la convicción del acusado o su absolución. En fin, el Tribunal Supremo Estadounidense resolvió que la supresión de prueba impugnatoria amerita la revocación de la condena y la celebración de un nuevo juicio sólo cuando su omisión constituya una lesión al derecho constitucional del acusado a que se le celebre un juicio justo, y cuando la supresión de dicha evidencia socave la confianza en el resultado del caso.

Más recientemente, en el caso de Kyles v. Whitley, 514 U.S. 419, 433-435 (1994), el Tribunal resolvió que hay cuatro aspectos sobre la pertinencia de la evidencia exculpatoria que el caso de Bagley aclara con respecto a la norma de Brady. De antemano, la evidencia favorable al

acusado alegadamente omitida debe ser pertinente (*material*) y debe existir una probabilidad razonable que de haber sido divulgada, el resultado del caso hubiese sido distinto. Kyles, aclara, además, que el concepto de pertinencia de Brady no implica una evaluación sobre la suficiencia de la prueba, más bien lo que se debe evaluar es si la evidencia omitida puede cambiar la perspectiva del caso al punto de minar la confiabilidad del fallo condenatorio. Por eso, el asunto no es si el Ministerio Público tiene prueba suficiente para justificar la convicción aun en ausencia de la prueba suprimida.

El Tribunal también concluyó en Kyles, supra, pág. 434, que cuando el fundamento para pedir el remedio del nuevo juicio sea la supresión de prueba exculpatoria, el acusado no tiene que demostrar que la divulgación de la evidencia probablemente le hubiera absuelto. La pregunta tampoco es si con dicha prueba es más probable que el acusado hubiera recibido un veredicto diferente. La cuestión a resolver es si en ausencia de la prueba favorable, se le celebró un juicio justo, es decir, un juicio cuyo resultado es digno de confianza. De manera que el estándar de pertinencia que establecieron los casos de Brady y Bagley se cumple cuando **el acusado demuestra que la evidencia suprimida puede razonablemente "arrojar una luz diferente sobre el juicio al punto de socavar la confianza en el resultado."** Kyles, supra, pág. 435.

Por otra parte, el caso de Kyles también explica que cuando el gobierno suprime prueba exculpatoria que cumple con los requisitos de Bagley, se incurre en un error de naturaleza constitucional para el cual no es necesario evaluar si fue un "error no perjudicial", pues el estándar de pertinencia de Bagley es más riguroso que el que se utiliza para determinar que un error constitucional no fue perjudicial.[9] Kyles, supra, págs. 435-436.

El Tribunal Supremo estadounidense también expresó que para resolver si el Estado está obligado a divulgar evidencia exculpatoria se debe evaluar el **efecto cumulativo** de la omisión de dicha evidencia y no cada pieza de evidencia de manera aislada. El Tribunal resolvió que la responsabilidad del Ministerio Público consiste en determinar cuándo es que se configura el estándar de probabilidad razonable, **responsabilidad que existe a pesar de que la policía no lleve dicha prueba a la atención de Ministerio Público.**[10]

En Pueblo v. Soto Ribas, 83 D.P.R. 386 (1961), citamos como autoridad en el tema del descubrimiento de prueba del acusado el caso de Jencks v. United States,

---

[9] Un error constitucional puede ser "no perjudicial" si el tribunal queda convencido más allá de duda razonable que de no haberse cometido el resultado del caso aparentemente hubiera sido el mismo. Véase Chapman v. California, 386 U.S. 18 (1967).

[10] Véase además y en general J.F. Lawless, Prosecutorial Misconduct, New York, Kluwer Law Book Pub., 1985, sec. 5.11, págs. 283-284, 290-292.

353 U.S. 657 (1957) para concederle la oportunidad al acusado de obtener copia de las declaraciones pertinentes y materiales de un testigo gubernamental que se encuentren en poder del gobierno y se relacionen con los hechos o actividades sobre las cuales el testigo ha declarado en corte, ello para propósitos de impugnación. Además expresamos que:

> No es necesario determinar si negarle al acusado copia de la declaración jurada por él solicitada para impugnar la veracidad de un testigo de cargo infringe los preceptos básicos del debido proceso de ley… Lo que aquí está envuelto no son conceptos mínimos de garantía constitucional. Hay algo más. Es el principio que sólo se hace justicia cuando se conoce toda la verdad… Es esencial a nuestro sistema de gobierno que se establezcan aquellas prácticas procesales que hagan más fácil el descubrimiento de la verdad. En una verdadera democracia todo ciudadano tiene derecho a que si es acusado de delito público, se le procese y condene bajo unas reglas que le garanticen un juicio justo en el concepto lato del término, ya que el Estado no está interesado en interponer obstáculos para que se conozcan todos los hechos y pueda descubrirse la verdad. (Citas omitidas.)

El caso de Pueblo v. Dones, 102 D.P.R. 118 (1974) constituye otro hito más en la liberalización del acceso a la evidencia que le sirva al acusado para refutar adecuadamente la que le es adversa. Allí declaramos que:

> Todo acusado que tiene su libertad en peligro debe tener al alcance de su mano los medios más amplios para demostrar que su acusador es un truhán, falto de integridad e indigno de crédito. Mientras más cortapisas y restricciones se opongan a esta prueba, mayor es el riesgo de que un testimonio mendaz y falso prevalezca en corte adulterando y deshonrando la justicia, convirtiendo el fallo judicial en trágico producto elaborado de la perversidad.

En Pueblo v. Hernández García, 102 D.P.R. 506 (1974) la defensa alegó en su solicitud de nuevo juicio que se había concedido inmunidad al único testigo de cargo que presenció los hechos; que se le había exigido la renuncia de la División de Drogas y Narcóticos y que el Ministerio Público había solicitado el archivo de varios casos en el que dicho agente era testigo de cargo. La fiscalía resistió activamente el descubrimiento de esta evidencia y asumió una actitud pasiva al no desmentir al testigo cuando negó la existencia de tales acuerdos. Ante este cuadro fáctico adoptamos la casuística federal referente al derecho a recibir evidencia exculpatoria tal y como fue reconocido en los casos de Napue, Brady y Giglio por lo que concluimos que había ocurrido una violación al debido proceso de ley del acusado. Por ello, le concedimos un nuevo juicio para que se pusiera a disposición de la defensa toda la información pertinente a la inocencia del acusado, que en este caso se trataba de evidencia para impugnar la credibilidad del testigo presencial. En este caso hicimos hincapié en la tendencia de algunos tribunales de reconocer la necesidad de un descubrimiento de evidencia total a pesar de que el criterio jurisprudencial Estadounidense no lo apoya.[11]

---

[11] United States v. Hibler, 463 F.2d 455 (9th Cir. 1972); Shuler v. Wainwright, 341 F. Supp. 1061, 1072 (M.D. Fla. 1972); Bass, V.: Brady v. Maryland and the Prosecutor's Duty to Disclosure, 40 U. Chi. L. Rev. 112 (1972); Traynor, Ground Lost and Found in Criminal Discovery, 39 N.Y.U.L. Rev. 228 (1964).

Véanse además <u>Pueblo v. Quiñones Ramos</u>, 99 D.P.R. 1 (1970); <u>Pueblo v. Tribunal Superior</u>, 102 D.P.R. 470 (1974); <u>Pueblo v. Delgado López</u>, 106 D.P.R. 441, 444 (1977) y <u>Pueblo v. Cancel Hernández</u>, 111 D.P.R. 625 (1981).[12]

Los casos que reconocen el derecho del acusado a obtener y presentar evidencia favorable que sea exculpatoria y de carácter impugnatorio a nivel de vista preliminar demuestran que en nuestra jurisdicción, la obligación del Estado de presentar evidencia exculpatoria o de impugnación de la prueba principal de cargo, no parte del derecho estatutario a descubrir prueba favorable contenido en la Regla 95, sino del derecho constitucional al debido proceso de ley y del derecho a enfrentar la prueba adversa. <u>Pueblo v. Ortiz Vega</u>, 149 D.P.R. 363 (1999); <u>Pueblo v. Vega Rosario</u>, 148 D.P.R. 981 (1999); <u>Pueblo v. Rodríguez Aponte</u>, 116 D.P.R. 653 (1985).

Por eso, en <u>Pueblo v. Arzuaga Rivera</u>, 160 D.P.R. 520, 533-536 (2003) explicamos que la obligación del Ministerio Público de entregar prueba relacionada a la inocencia del acusado surge en situaciones no

---

[12] Véanse <u>ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Discovery and Procedure before Trial</u> (Approved Draft, 1970), sec. 2.1(d); <u>ABA Project on the Standards for Criminal Justice, Standards Relating to the Prosecution Function and Defense Function</u> (Approved Draft, 1971), sec. 3.11. Véase además la Regla 4.9 del National Advisory Commission on Criminal Justice Standards and Goals, <u>Report on Courts</u>, Washington, 1973, pág. 89.

contempladas por las Reglas de Procedimiento Criminal. Como señalamos, "[l]a llave que da acceso a esta posibilidad es una sola y se llama debido proceso de ley". Id. pág. 534. Por tal razón, en casos como Pueblo v. Hernández García, supra, aplicamos el criterio establecido en la jurisprudencia federal en cuanto a que la solicitud expresa de la defensa no se estima un requisito. Así, la ausencia de un requerimiento específico no libera al fiscal de poner a la disposición del acusado prueba relativa a su defensa. Este principio fue reiterado en Pueblo v. Rodríguez Sánchez, 109 D.P.R. 243, 247 (1979) y Pueblo v. Cancel Hernández, supra, pág. 628.

En Pueblo v. Rodríguez Sánchez, supra, resolvimos que para que el derecho del acusado a "carearse con los testigos de cargo" tenga concreción y sentido, el debido proceso de ley exige que se pongan a disposición del acusado:

> …los medios de prueba para impugnar a los testigos, atacar su credibilidad y todo recurso análogo encaminado a erradicar la falsedad del juicio y evitar el desvío de la justicia. Un careo sin estos instrumentos, cuando sean legítimamente asequibles, frustra el propósito del precepto constitucional. Id., pág. 249.

De acuerdo a nuestro dictamen, si se le oculta al acusado prueba de esta naturaleza, y hay una probabilidad razonable de que el jurado o el juez, de conocerla, hubiesen rendido un fallo distinto, "es responsabilidad del Estado en su obligación de proveer un juicio justo

bajo la cláusula de debido proceso de ley, y aún sin mediar solicitud de la defensa", revelar dicha prueba. Id., pág. 247.

A modo de guía, la Regla 44 de Evidencia, 32 L.P.R.A. Ap. IV, R.44, provee un listado no taxativo de distintos medios de impugnación.[13] Según hemos interpretado esta Regla, "toda prueba pertinente a la veracidad o mendacidad de un testigo es *prima facie* admisible para evaluar su credibilidad." Pueblo v. Galindo, 129 D.P.R. 627 (1991); Pueblo v. Figueroa Gómez, 113 D.P.R. 138, 142 (1982).

La doctrina ha dividido la prueba de impugnación en dos clases generales, a saber, la prueba de impugnación "específica" y la prueba de impugnación "no específica".[14] La primera va dirigida a atacar el testimonio particular vertido por el testigo. Bajo esta clasificación se encuentra la impugnación de un testigo mediante prueba que establezca que ha incurrido en contradicciones.

En Pueblo v. Galindo, supra, págs. 642-644, aclaramos que

> …a pesar de no haberse incluido expresamente en esta regla, no cabe duda de que una instancia clásica de impugnación de un testigo es la prueba de contradicción del testimonio vertido en el juicio… Por tratarse

[13] La regla dispone que "[l]a credibilidad de un testigo podrá ser impugnada o defendida mediante cualquier evidencia pertinente, incluyendo" los ejemplos que la Regla menciona. Regla 44, supra. (Énfasis suplido.)

[14] Véase Imwilkelried, Exculpatory Evidence, op. cit. pág. 302.

de evidencia que demuestra que lo que ha dicho el testigo en el juicio no es cierto, su pertinencia respecto a la veracidad o mendacidad del resto del testimonio es obvia… El propósito de la impugnación por contradicción es atacar instancias específicas del testimonio del declarante. Es decir, se persigue demostrar, contradiciendo al testigo, que algo de lo vertido en el juicio es falso, inexacto, poco preciso o erróneo… Lo cardinal es que contradiga lo aseverado por el testigo ante el juzgador de los hechos… Con este propósito, **además de la declaración de otro testigo**, cualquier evidencia extrínseca será admisible para contradecir lo declarado por el testigo y demostrar que mintió en la silla testifical.[15]

La impugnación por contradicción fue incorporada a nuestras Reglas de Evidencia mediante la Ley núm. 450 del 23 de septiembre del 2004 que enmendó la Regla 44, supra.[16] Dicha enmienda acogió el lenguaje de la Sección 780 (i) del Código de evidencia de California para establecer que la credibilidad de una persona puede impugnarse mediante cualquier evidencia pertinente que establezca la "existencia o inexistencia de un hecho declarado por el testigo; sujeto a lo dispuesto en la Regla 19". Regla 44 B (7), supra.[17]

---

[15] En esa ocasión citamos la obra de E.W. Cleary, McCormick on Evidence, 3ra ed., Minnesota, Ed. West Publishing Co., 1984, sec. 43.

[16] En la exposición de motivos, la legislatura se hizo eco de nuestras expresiones jurisprudenciales al declarar que "[l]a impugnación de los testigos es uno de los mecanismos más eficaces para el descubrimiento de la verdad y es un corolario del contrainterrogatorio."

[17] Véase además F. A. Gilligan & E.J. Imwilkelried, Bringing the "Opening the Door" Theory to a Close: The Tendency to Overlook the Specific Contradiction Doctrine in Evidence Law, 41 Santa Clara L. Rev. 807 (2001).

Por otro lado, la prueba de impugnación "no específica" va dirigida a atacar de forma general al testigo como tal. Entre las causas "no específicas" para impugnar el testimonio de un testigo se encuentra la impugnación por parcialidad o interés. Aun cuando un testigo esté concientemente tratando de ser sincero, la parcialidad puede distorsionar el contenido de su testimonio en un nivel subconsciente. Por ello, prueba extrínseca de la parcialidad de un testigo es rutinariamente admisible. En este sentido, los tribunales son generalmente laxos. Imwilkelried, Gianelli, Gilligan & Lederer, Courtroom Criminal Evidence, 4ta ed., San Francisco, Lexis Nexis, 2005, págs. 310-313.[18]

La doctrina es clara al expresar que **la parcialidad de un testigo se puede demostrar con prueba de que el testigo es un informante retribuido.**[19] Imwilkelried, Gianelli, Gilligan & Lederer, id. En torno a este tema, Ernesto L. Chiesa, explica que:

---

[18] Véase Davis v. Alaska, 415 U.S. 308, 316 (1974), donde se estableció que exponer los motivos que tiene un testigo para testificar es una función importante y propia del derecho constitucional a contrainterrogar los testigos adversos. Véase además Greene v. McElroy, 360 U.S. 474 (1959).

[19] Véanse además U.S. v. Bradfield, 103 F.3d 1207, 1215-18 (5to Cir.), 113 F.3d 515 (5to Cir. 1997) (aún cuando el acusado no las solicite, se tienen que dar instrucciones cautelares especiales sobre la credibilidad de un testigo retribuido) y Wheeler v. U.S. 351 F. 2d 946 (1er Cir. 1965).

La parcialidad de un testigo es un elemento crucial para el juzgador evaluar el peso del testimonio… es un asunto tan central para evaluar su testimonio que nunca se considera colateral, por lo que se permite evidencia extrínseca de la parcialidad cuando el contra interrogatorio del testigo no revela adecuadamente tal parcialidad… Se trata de un aspecto central del derecho constitucional del acusado a confrontarse con los testigos del fiscal… **Es particularmente importante el derecho del acusado a que el juzgador conozca los beneficios que recibe o espera recibir un testigo de cargo por su testimonio…** Lo mismo en casos civiles que en casos criminales, cualquier tipo de interés del testigo en testificar, más allá del deber de hacerlo y del interés de que se haga justicia es pertinente en cuanto a parcialidad." E.L. Chiesa, Tratado de Derecho Probatorio, Tomo 1, Publicaciones JTS, pág. 465-467,471.[20]

En Pueblo v. Colón Obregón, 102 D.P.R. 369, 373 (1974), caso en el que la defensa no solicitó instrucciones especiales con respecto a los pagos contingentes recibidos por un agente encubierto, aprovechamos la ocasión para mencionar que cuando hay **"informantes** adictos o **a sueldo**, especialmente cuando es contingente su pago, su testimonio debe escudriñarse para determinar su confiabilidad" con especial rigor. Véanse además Pueblo v. Almodóvar, 109 D.P.R. 117 (1979; Pueblo v. Acevedo Estrada, supra. [21]

---

[20] El autor nos remite al caso de U.S. v. Abel, 469 U.S. 45,52 (1984) para el tema de la parcialidad de los testigos y al caso de Davis v. Alaska, 415 U.S. 308 (1974).

[21] Véase en general Mario Daniel Montoya, Informantes y técnicas de investigación encubiertas, 2da ed. Buenos Aires, Ad Hoc, 2001.

Ahora bien, en nuestra jurisdicción, la identidad del informante o confidente está protegida expresamente por la Regla 32 de Evidencia, 32 L.P.R.A. Ap. IV.[22] Como es sabido, las reglas de exclusión "pueden estar fundadas en consideraciones ajenas a la búsqueda de la verdad, independientemente de su valor probatorio".[23] Reglas como la citada están basadas en consideraciones de política pública que ameritan anteponerse al propósito esencial del descubrimiento de la verdad. Ya en Pueblo v. Soto Ribas, supra, pág. 389, habíamos expresado que:

> En ausencia de un requisito gubernamental exigiendo que se mantenga confidencial la información obtenida para el más eficaz cumplimiento de la ley, el Estado no tiene interés en negarle al acusado acceso a toda evidencia que pueda dar luz sobre las cuestiones envueltas en el caso, **y en particular no hay interés en condenar basándose en declaraciones de testigos que no han sido rigurosamente contrainterrogados e impugnados tan a fondo como la evidencia permitiría.** (Citas omitidas y énfasis suplido.)

Sobre el asunto, el Tribunal Supremo de Estados Unidos, resolvió, en el caso de Roviaro v. U.S., 353 U.S. 53 (1957), que no existe una regla fija para determinar cuándo se justifica la divulgación de la identidad del

---

[22] Valga señalar que tradicionalmente, en términos del privilegio evidenciario, se le ha dado el mismo trato a los términos "confidente" e "informante". En Pueblo v. López Rivera, 91 D.P.R. 693, 696-967 (1965), al acoger la doctrina de U.S. v. Roviaro, 353 U.S. 53 (1957), tradujimos "informer's privilege" como "privilegio del confidente" refiriéndonos al privilegio del Estado a no divulgar la identidad de aquellas personas que suministran a las autoridades información sobre violaciones de ley. Véase además Angueira v. JLBP, 150 D.P.R. 10, 26 (2000).

[23] E. Chiesa, op. cit. tomo I, pág. 4.

informante.  El asunto conlleva un balance de intereses mediante el cual se deben sopesar el interés público en la protección de la información y el derecho del acusado a preparar su defensa. Roviaro, supra, pág. 62. De acuerdo a los intereses imperantes en proteger la amplitud del descubrimiento de prueba de la defensa, la misma Regla 32 de Evidencia establece las excepciones que permiten la divulgación de la identidad del informante. Una de estas excepciones es "que la información sobre su identidad es esencial para una justa decisión de la controversia, particularmente cuando es esencial para la defensa del acusado." Regla 32 de Evidencia, supra.

En Pueblo v. López Rivera, 91 D.P.R. 693 (1965) resolvimos que el caso de Roviaro, supra, estableció una excepción al privilegio del informante llamada la del 'confidente-participante' (*participant-informer rule*). Explicamos que el 'confidente-participante', como el término indica, participa en el acto delictivo, diferenciándose así del mero confidente que suple información a las autoridades pero que no tiene participación en los hechos de los cuales surge el delito. Si bien el hecho de que el confidente sea participante no le concede al acusado un derecho automático a conocer su identidad, resolvimos que una controversia de esta naturaleza debe resolverse caso a caso.

El factor determinante debe ser siempre que la identidad del confidente sea necesaria y pertinente para la adecuada defensa del acusado. No obstante reconocer en la jurisprudencia la importancia del factor de la participación del confidente, hemos recalcado que "la distinción entre el meramente informante y el informante participante es pertinente pero no decisiva". Pueblo v. López Rivera; supra; Benítez v. Tribunal Superior, 102 D.P.R. 601 (1974); E. Chiesa, op. cit. Tomo I, págs. 313-314. Reiteradamente hemos declarado que:

> El descubrimiento de prueba en el proceso criminal debe ensancharse hasta donde permita la competencia entre el interés del acusado en su defensa y la confidencialidad de determinados documentos y expedientes, moderada por una discreción judicial que habrá de decidir si la utilidad que para la defensa representa esa prueba supera los intereses del Estado y de terceras personas a cuya protección va dirigida la norma de secretividad. Pueblo v. Rodríguez Sánchez, 109 D.P.R. 243, 248 (1979).[24]

Cónsono con el análisis dispuesto en Roviaro, supra, hay quienes plantean que cuando el Estado llame al estrado a un informante para que testifique, hay que divulgar su identidad, pues se considera que el hecho de ser informante es un asunto significativo para adjudicar la credibilidad de su testimonio. § 5712 Wright & Graham, Federal Practice and Procedure, Thomson, West, 1992, págs. 424-425. En este sentido, tras sopesar los intereses involucrados en un caso en el cual un

---

[24] Véase además Pueblo v. Cancel Hernández, 111 D.P.R. 625 (1981).

confidente sea llamando al estrado para testificar como parte de la prueba de cargo, la "balanza" debe favorecer al acusado.[25]

Lo anterior cobra mayor pertinencia cuando el testimonio del informante es central o esencial para la prueba del Estado al punto que la convicción dependa del mismo. De esta misma manera, resulta claro que si el Estado utiliza el testimonio en corte de una informante remunerada y divulga su nombre y demás información personal, la naturaleza de su relación con el Estado y todo contrato o acuerdo entre ellos adviene prueba de impugnación necesaria para adjudicar sobre la credibilidad que merezca su testimonio. Esta prueba no sólo cumple con la excepción establecida en la Regla 32 de Evidencia, supra, sino que es del carácter cuya divulgación la jurisprudencia interpretativa de la Constitución ha hecho obligatoria. De no revelarse, una persona imputada de delito no podrá gozar de las garantías de justicia que conforman los cimientos ideológicos de nuestro ordenamiento jurídico penal.

III

En materia de descubrimiento de prueba favorable al acusado, y tomando en cuenta las consideraciones que motivan nuestra continua tutela de los derechos del

---

[25] Véase además <u>Disclosure of Informers who might establish the accused's innocence</u>, 12 Stan. L. Rev. 256 (1959).

acusado frente al Estado, hemos establecido que las acciones del ministerio fiscal para cumplir con sus deberes constitucionales están regidas por limitaciones temporales. Este Tribunal ha determinado que lo que incide en los derechos del acusado que garantiza nuestra Carta de Derechos no es sólo la omisión de prueba exculpatoria o de prueba favorable, sino el momento en que ésta se entrega.

Hace cincuenta años, en Pueblo v. Tribunal Superior y Ramos, 80 D.P.R. 702, 705 (1958), declaramos que por razón de que "[n]o se debe perder de vista que el objetivo de todo procedimiento judicial es el esclarecimiento de la verdad", rechazábamos las "arcaicas tendencias" de no concederle al acusado, con razonable anticipación al juicio, la prueba necesaria para enfrentar la evidencia del Estado.[26] Adoptamos el moderno proceder en materia de descubrimiento de prueba por parte del acusado, implantando desde entonces "el imperante sistema de conceder al acusado las más amplias oportunidades para defenderse".

Al respecto dijimos que:

> Aunque podría argüirse que el acusado podría esperar al acto del juicio y entonces solicitar que se produzcan los informes una vez declare el agente policiaco, tal práctica conduciría a una innecesaria dilación en los procedimientos, en perjuicio del principio de "tramitación justa" y de evitación de "dilaciones y gastos

---

[26] Estas tendencias nos venían del derecho común inglés, en el cual no se permitía por ejemplo, la entrega de las declaraciones juradas (probablemente incriminatorias) de los acusados hasta el día del juicio.

injustificados" que leemos en la número uno de las Reglas de Procedimiento Criminal. <u>Pueblo v. Tribunal Superior</u>, supra, pág. 476.

En <u>Pueblo v. Ortiz Vega</u>, 149 D.P.R. 363 (1999) el Ministerio Público no puso a la disposición del imputado la prueba pertinente en su poder sobre manifestaciones adversas de su único testigo de cargo, **con antelación suficiente** para que la defensa pudiera ejercitar efectivamente su derecho a contrainterrogarlo en la vista preliminar. Resolvimos que dicha práctica "no es cónsona con la naturaleza esencial de nuestro sistema de justicia criminal que preconiza la búsqueda de la verdad como principio fundamental que permea todo procedimiento judicial." Véase además <u>Pueblo v. Arzuaga Rivera</u>, 160 D.P.R. 520 (2003).

Tanto en <u>Pueblo v. Santa Cruz-Bacardi</u>, 149 D.P.R. 223 (1999) como en <u>Pueblo v. Guzmán Meléndez</u>, 2004 TSPR 13, reiteramos la obligación del Ministerio Público de entregar oportunamente a la defensa la prueba necesaria para enfrentar los cargos imputados y la evidencia utilizada por el Estado para sustentarlos. En ambos casos se le imputaba a los acusados conducir vehículos de motor con una cantidad de alcohol en la sangre mayor al límite establecido en la ley. El primer día del juicio se le entregó a la defensa el Manual de Operaciones del instrumento utilizado para determinar el por ciento de alcohol en la sangre, las certificaciones de los peritos sobre su uso y los informes de mantenimiento del mismo.

En ambos casos resolvimos que la entrega de la evidencia el primer día del juicio afectó el derecho de los acusados a preparase adecuadamente para su defensa a tal grado, que no estaban preparados para enfrentar un juicio en su contra

En la jurisdicción federal se ha resuelto que la prueba favorable al acusado que sea relativa a cualquier asunto sobre inocencia o castigo, o cuyo uso se relacione incidentalmente a estos asuntos, puede ser entregada en cualquier momento, inclusive durante el juicio.[27] A pesar de esto, los tribunales apelativos federales han reconocido, mayoritariamente que la entrega debe ser oportuna, es decir, en un momento en que el acusado pueda usarla efectivamente.

Cuando se trata de la entrega tardía de prueba favorable relativa a la inocencia o castigo del acusado (*belatedly disclosure of favorable evidence*), el enfoque jurisprudencial de varios circuitos apelativos radica en determinar el efecto de la tardanza en la capacidad del acusado para utilizar la evidencia efectivamente. A pesar de que en otros circuitos federales se han establecido requisitos adicionales para alegar una violación al debido proceso de ley por entrega inoportuna de prueba favorable, la inhabilidad para usar efectivamente la evidencia inoportunamente entregada es el estándar que se

---

[27] Imbler v. Pachtman, 424 U.S. 409, 427 n. 25 (1976).

ha considerado de uso mayoritario en la jurisdicción federal. [28]

La oportunidad que se le debe brindar a la defensa para usar la evidencia efectivamente ha sido definida como "la oportunidad que tiene un abogado responsable de usar la evidencia con cierto grado de cálculo y premeditación". **De acuerdo a este criterio, la entrega inoportuna no constituye una divulgación conforme a Brady, supra**. Debe quedar claro que no es suficiente que la fiscalía se limite a evitar la "supresión activa de evidencia". Leka v. Portuondo, 257 F. 3d 89, 103 (2do Cir. 2001); Madsen v. Domire, 137 F. 3d 602 (8vo Cir. 1998); Kyle v. U.S., 297 F 2d 507 (2do Cir. 1961).[29]

La entrega inoportuna de evidencia favorable constituye una supresión si el acusado no tuvo la

---

[28] Por ejemplo se ha resuelto que la defensa debe demostrar que la evidencia entregada inoportunamente no es meramente acumulativa. También se ha resuelto que si la evidencia entregada inoportunamente es impugnatoria, el acusado debe demostrar que no tuvo la oportunidad de contrainterrogar al testigo en cuanto al hecho que establece la prueba que le fue entregada tarde. Se ha considerado como factor adverso al planteamiento de la defensa el que el estado haya presentado otra evidencia contundente que sustente la convicción. Véase Bennett L. Gershman, Prosecutorial Misconduct, 2da ed., Sec. 5:15, (revisado en septiembre del 2007).

[29] Véanse además U.S. v. Rodríguez, 496 F. 3d 221 (2do Cir. 2007); Di Simone v. Phillips, 461 F. 3d 181 (2nd Cir. 2006); U.S. v. Watson, 76 F. 3d 4 (1er Cir. 1996); U.S. v. Devin, 918 F. 2d 280 (1er Cir. 1990); U.S. v. Martínez-Mercado, 888 F. 2d 1484 (5to Cir. 1989); U.S. v. Beherens, 689 F. 2d 154 (10mo Cir. 1982); U.S. v. Shelton, 588 F.2d 1242 (9no Cir. 1978) y U.S. v. Stone, 471 F. 170 (7mo Cir. 1972). Un caso resuelto por una corte de distrito federal U.S. v. Greichunos, 572 F.Supp. 220 (N.D. Ill. 1983) también aplica este estándar.

oportunidad de utilizarla efectivamente. De esa forma, la casuística ha impuesto una carga sobre el Ministerio Público. El fiscal tiene el deber de descubrir, oportunamente, toda la evidencia favorable que esté en las manos del gobierno, incluyendo la policía. El fiscal es quien, a fin de cuentas, lleva la representación del Gobierno en el juicio y es

> …quien conduce la investigación y el acopio de pruebas por lo que en dicho funcionario se centra y concreta todo el proceso acusatorio capaz de producir la privación de libertad como resultado de convicción. Pueblo v. Rodríguez Sánchez, supra, pág. 248.

Antes hemos mencionado que en nuestra jurisdicción, el conocimiento o desconocimiento que tenga el Ministerio Público sobre la existencia de la prueba favorable a la defensa del acusado que esté en manos del Gobierno, "no tiene efecto alguno al determinar si al acusado se le violó el debido proceso de ley, puesto que lo que realmente cuenta [es la] posibilidad de daño al acusado y cómo tales hechos pudieran variar el veredicto." Pueblo v. Hernández García, supra; Pueblo v. Rodríguez Sánchez, supra, pág. 248.

Después de todo, "[l]a obligación de descubrir la verdad es del Estado acusador."[30] El deber del Ministerio Público responde, en esencia, a lo que reiteradamente hemos recalcado en muchas de nuestras expresiones- los

---

[30] E.L. Chiesa, Derecho Procesal Penal, vol. II, sec. 10.3, pág. 30.

procesos judiciales "no son competencias en las cuales ha de prevalecer el más listo."[31]

Ya hemos dicho que:

> …no resta dignidad al fiscal demandar y exigir de los funcionarios correspondientes la evidencia cuyo descubrimiento ha ordenado el tribunal. Aun cuando el abogado del pueblo de Puerto Rico ha de procesar al acusado con determinación y vigor, debe una lealtad primaria al interés superante de su cliente en que se haga justicia. El fiscal es el servidor de la ley cuyo objetivo dual es que el culpable no escape ni el inocente sufra. Pueblo v. Rodríguez Sánchez, supra.

En Pueblo v. Santa Cruz Bacardi, supra, quedó establecido que el Ministerio Público y la Policía de Puerto Rico son dos dependencias gubernamentales que "están estrechamente ligadas en la investigación y el procesamiento criminal, por lo que "deben coordinar cuidadosamente sus esfuerzos por encausar a las personas imputadas de un delito". Tomando esto en consideración, un Fiscal no puede alegar, ante su incumplimiento con el deber de entregar prueba favorable, que la prueba requerida está en manos de la Policía de Puerto Rico o en las de cualquier otra dependencia gubernamental. Id. pág. 235.

Como dijéramos en Pueblo v. Rodríguez Sánchez, supra, es responsabilidad del fiscal exigir, de quien los

---

[31] A fin de cuentas, el interés principal del Estado en una causa criminal no es ganar un caso, sino que se haga justicia. "El celo por encauzar al criminal, sobre todo cuando lo motiva, además, el interés por quedar bien ante la opinión publica, no justifica nunca la utilización de medios contrarios a la meta reseñada." Pueblo v. Delgado López, supra, pág. 444; Pueblo v. Ortiz Vega, 149 D.P.R. 363 (1999).

tenga, los informes de los agentes encubiertos en todo caso en el que el acusado justifique la necesidad de los mismos, o como en el caso de autos, cuando el tribunal haya autorizado dicho descubrimiento.

Cabe resaltar que en consideración a la delicadeza del asunto sobre el descubrimiento oportuno de prueba favorable o de prueba exculpatoria, ha quedado resuelto que se puede prescindir de autorización u orden judicial cuando a petición del acusado se le requiera al Ministerio Público prueba que está en poder del Estado.[32]

Hemos resuelto que el Ministerio Público no debe descansar en el poder del Tribunal de Primera Instancia para tratar de obtener documentos relacionados al descubrimiento de prueba que se encuentran en manos de otras agencias de gobierno ya que…

> …para los fines del descubrimiento de prueba, las Agencias de Gobierno de Puerto Rico no son consideradas entidades privadas. Es por ello que el Ministerio Público tiene el deber de hacer las gestiones pertinentes con las agencias gubernamentales para obtener el descubrimiento de prueba requerido, de manera que la defensa de un acusado sea una adecuada. Por tanto, resulta meridianamente claro que el ministerio Fiscal se encuentra en una relación interagencial con las demás agencias de gobierno, en especial, cuando se habla de cualquier otra división del Departamento de Justicia o de la Policía, **lo que obliga a éste a gestionar prontamente sin la intervención de**

---

[32] Aún cuando la Regla 95 (c), establece que:

El Ministerio Fiscal deberá informar al tribunal si el material o la información solicitada no se encuentra en su posesión, custodia o control, en cuyo caso el tribunal ordenará a la persona o entidad que la posea, custodie o controle, que la ponga a la disposición del acusado.

**los tribunales el descubrimiento de prueba que le sea requerido**. Pueblo v. Guzmán Meléndez, supra.

IV

En el caso de autos, la única prueba de cargo que señaló al peticionario y lo vinculó a la comisión de un delito fue el testimonio de Zoe Díaz Colón, pues el examen sobre las huellas dactilares encontradas en el lugar de los hechos arrojó un resultado negativo. Tampoco se presentó el testimonio de otros testigos de cargo durante el juicio. Por estas razones, el testimonio de Zoe Díaz Colón fue la prueba esencial del caso del Ministerio Público, por lo que toda prueba que sirviera para impugnar la credibilidad de esta testigo no sólo es favorable a la defensa del acusado, sino que es pertinente en cuanto a la inocencia o culpabilidad del acusado de acuerdo a Giglio v. U.S, supra y U.S. v. Bagley, supra.

El contrato como confidente de Zoe Díaz Colón, otorgado días antes de los hechos, estuvo siempre bajo la custodia de la Policía de Puerto Rico; así lo atestiguó uno de los testigos de cargo en la vista sobre nuevo juicio. Aún cuando no es imprescindible en casos como el de autos, el peticionario fue claro y asertivo en sus reiteradas solicitudes de descubrimiento de prueba al requerir que se le entregaran cualquier contrato o acuerdo entre el Estado y Zoe Díaz Colón y los informes

policíacos de los agentes a cargo de la investigación del caso.

El Ministerio Público se limitó a anunciar en las vistas con antelación al juicio que no se le había ofrecido inmunidad a la testigo de cargo. Este hecho no sólo incumple con lo solicitado por la defensa, sino que atenta contra los postulados de verdad y justicia que deben prevalecer en nuestros procedimientos penales pues con esa información se distorsionó la adjudicación de credibilidad del Tribunal de Primera Instancia en cuanto al testimonio de Zoe Díaz Colón.[33]

En fin, el peticionario tenía derecho a obtener copia del contrato de confidente de Zoe Díaz Colón, pues su condición de informante retribuida debió haberse planteado ante el juzgador de los hechos como factor pertinente para impugnar la credibilidad de su testimonio que resultó ser central a la acusación del Estado. Además, la concurrencia entre el momento en que Zoe Díaz Colón se convierte en informante y el día en que ocurren los hechos, así como el tiempo transcurrido hasta que ella prestó su declaración jurada son aspectos que

---

[33] Algunos tribunales han indicado que una convicción puede ser revocada cuando el Ministerio fiscal no sólo suprime evidencia favorable, sino que además hace comentarios en corte abierta malinterpretando, negando, o distorsionando hechos que serían expuestos a través de la evidencia suprimida. Véanse Kyle v United States, 297 F2d 507 (1961, 2do Cir.) Certiorari denegado en 377 U.S. 909; Jackson v Wainwright, 390 F2d 288 (1968, 5to Cir.).

nuestra jurisprudencia ha reconocido que inciden sobre la credibilidad que pueda merecer su testimonio.

Por otra parte, de lo perfilado en la vista sobre nuevo juicio también surge que los informes de los agentes investigadores nunca se habían "perdido y encontrado" como alegó el Ministerio Público el primer día del juicio. El Tribunal de Primera Instancia había concedido la solicitud de la defensa en cuanto a esta prueba. El Ministerio Público nunca cuestionó esta resolución ni alegó que se tratara de prueba impertinente o que su revelación afectaría la seguridad del Estado o las labores investigativas de sus agentes policiacos. Por el contrario, el Ministerio Público y los agentes de la Policía de Puerto Rico le hicieron representaciones a la defensa sobre sus alegadas gestiones para conseguir los informes antes del juicio, al punto que la defensa declaró haber culminado su descubrimiento descansando en lo prometido y alegado por el Estado. Si la defensa anunció el 6 de mayo de 1999 que su descubrimiento de prueba estaba completo, (cosa que no consta de las minutas) fue luego de que se le informara que los agentes conseguirían la información que faltaba para cumplir con la orden del tribunal. Según se desprende de la minuta del 6 de mayo, el descubrimiento de prueba no estaba completo.

Los informes y expedientes policiacos entregados el primer día del juicio contenían los nombres de posibles

testigos que podían refutar el testimonio de Zoe Díaz Colón en cuanto a aspectos centrales de sus alegaciones. Además, la Policía de Puerto Rico había entrevistado a esos testigos y de las expresiones que éstos le hicieron a los agentes, se colige el carácter impugnatorio de su testimonio, pues contradecían lo atestiguado por Zoe Díaz Colón en varios aspectos.

La concurrencia de varios factores nos lleva a concluir que en el caso de autos, la entrega de estos informes el primer día del juicio fue insosteniblemente onerosa.

El juicio duró aproximadamente dos semanas durante las cuales la defensa comparecía al tribunal y efectuaba las diligencias para conseguir a los testigos que surgieron de los expedientes policiacos. Durante el tiempo que transcurrió entre los hechos imputados y la fecha de los procedimientos judiciales algunos testigos se mudaron fuera del país, enfermaron o sus circunstancias personales cambiaron al extremo de no estar disponibles para responder a tan apresurado requerimiento. La localización geográfica (zona montañosa) del lugar de los hechos y las condiciones de los escritos de los agentes (en manuscrito e identificando a los entrevistados por sus apodos) fueron otros factores que razonablemente dificultaron la tarea de conseguir a los testigos potenciales que aparecen en los expedientes policíacos.

Además, la naturaleza grave del delito y el hecho de que el Estado sólo utilizó el testimonio de una sola testigo (que luego resultó ser informante retribuida) para relacionar al peticionario con el asesinato hacían más imperante la entrega anticipada de los informes policiacos.

Dadas las circunstancias particulares de este caso, no podemos concluir que la defensa haya tenido la oportunidad que necesita todo abogado responsable para usar la evidencia con cierto grado de cálculo y premeditación. Por tal razón, la entrega tardía de los expedientes policiacos constituyó una omisión constructiva de la evidencia allí contenida al no permitir su uso efectivo.

Debemos determinar si la prueba que no fue divulgada y la que fue entregada inoportunamente constituye prueba pertinente para una solicitud de nuevo juicio. Acorde a la doctrina que hemos discutido anteriormente, procede resolver **si en ausencia de la prueba pertinente en cuanto a inocencia o culpabilidad que fue suprimida, el peticionario gozó de un juicio justo, es decir, de un juicio cuyo resultado es digno de confianza, o si en cambio, de haber sido presentada, la prueba omitida hubiese arrojado una luz diferente en el juicio al punto de socavar la confianza en el resultado. Este es el estándar aplicable para determinar si hay una probabilidad razonable de un veredicto diferente que**

**amerite un nuevo juicio cuando las actuaciones del Estado ocasionan que el acusado no haya tenido acceso a la evidencia durante la etapa del juicio original.**

De acuerdo a la jurisprudencia esbozada, tanto el contrato de informante retribuida de Zoe Díaz Colón como el expediente policiaco constituyen prueba que confronta la evidencia del Estado y sirve para impugnar su credibilidad y contradecirla. De haber estado sujeta a la adjudicación del Tribunal de Primera Instancia, esta prueba hubiera razonablemente socavado la confianza en la única evidencia que sostenía la acusación del Estado, el testimonio de Zoe Díaz Colón, testimonio que además requiere un trato particular y cauteloso. De acuerdo al análisis que antecede, procede revocar la sentencia condenatoria y conceder un nuevo juicio al peticionario.

Se dictará Sentencia de conformidad.


                                        Liana Fiol Matta
                                        Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico                          *Certiorari*
        Recurrido

                                   CC-2003-218

        v.


Carmelo Velázquez Colón
        Peticionario


*SENTENCIA*


En San Juan, Puerto Rico, a 18 de julio de 2008.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca la sentencia condenatoria y se concede un nuevo juicio al peticionario.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton disiente con opinión escrita. La Jueza Asociada señora Rodríguez Rodríguez acompaña su disenso con la siguiente expresión: Disiento del curso trazado hoy por este Tribunal en la Opinión que hoy anuncia, pues difiero del estándar distendido que se adopta para determinar cuándo procede revocar una sentencia y ordenar un nuevo juicio. Además, soy del criterio que la Opinión no salva, adecuadamente, las diferencias que existen entre la figura del informante frente al confidente, lo que supondrá dificultades en lo sucesivo. En virtud de ello, no puedo impartirle mi anuencia a la Opinión del Tribunal.


                        Aida Ileana Oquendo Graulau
                        Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

          v.                          CC-2003-218      Certiorari

Carmelo Velázquez Colón

    Peticionario


Opinión Disidente emitida por el Juez Presidente señor Hernández Denton


San Juan, Puerto Rico, a 18 de julio de 2008.

Si bien coincidimos con la Opinión del Tribunal, en cuanto al estándar aplicable para determinar si procede una moción de nuevo juicio en circunstancias como las del caso de autos, nos vemos en la necesidad de disentir con el resultado de la misma por entender que el caso debió ser devuelto al foro de instancia para que sea éste el que evalúe la moción de nuevo juicio a la luz de la normativa adoptada. En vista de que este Tribunal no había pautado la norma aplicable y, de hecho, el tribunal de instancia hizo su análisis al amparo del escrutinio tradicional de error no perjudicial, debe dársele la oportunidad al referido foro para que,

previa la celebración de una vista, haga la determinación correspondiente.

Dicho proceder sería cónsono con el curso de acción tomado por el Tribunal Supremo de Estados Unidos en el caso de U.S. v. Bagley, 473 U.S. 667 (1985). En ese caso normativo –cuyos hechos son muy similares a los del caso de autos– el fiscal no reveló, a pesar de la oportuna solicitud de la defensa, un acuerdo entre uno de los testigos de cargo y el ministerio público por medio del cual el Estado acordó remunerar al testigo por la información que éste vertiera en el juicio. Una moción de nuevo juicio presentada por la defensa a raíz de lo anterior, fue denegada por el foro de instancia al resolver que la omisión del fiscal constituía un error no perjudicial. Posteriormente, la Corte de Apelaciones de los Estados Unidos para el Noveno Circuito dejó sin efecto dicha determinación por entender que procedía la revocación automática. El Tribunal Supremo Federal, a su vez, revocó a dicho tribunal apelativo y devolvió el caso al foro primario para que celebrara una vista y evaluara la moción de nuevo juicio bajo el estándar de probabilidad razonable de que el resultado de los procedimientos sería distinto. Dicho foro, además, resolvió que para ello el tribunal de instancia debía tomar en consideración el efecto acumulativo de la evidencia suprimida.

A pesar del curso de acción del Tribunal Supremo Federal en Bagley y de la similitud entre los hechos de ese caso y los del caso de autos, la Opinión del Tribunal revoca la sentencia de culpabilidad y ordena la celebración de un nuevo

juicio, en lugar de devolver el caso al tribunal de instancia para que celebre la vista correspondiente. La opinión del Tribunal basa su determinación en lo resuelto por el máximo foro federal en Kyles v. Whitley, 514 U.S. 419 (1995).

En el referido caso, el Tribunal Supremo Federal revocó una sentencia de culpabilidad luego de determinar que el fiscal había ocultado evidencia exculpatoria. No obstante, los hechos de Kyles presentan unas particularidades que lo distinguen sustancialmente del transfondo fáctico que nos ocupa: **ese era un caso de pena de muerte, en el que un primer jurado había sido disuelto por no ponerse de acuerdo para un veredicto de culpabilidad, y en el cual la evidencia suprimida por el fiscal parecía inculpar al principal testigo de cargo**. Además, el principal testigo del Estado había cambiado su testimonio y la descripción del supuesto asesino brindada por otros testigos no coincidía con las características físicas de Kyles.

Evidentemente, la marcada diferencia entre los hechos de Kyles y Bagley en lo que respecta a la naturaleza de la evidencia suprimida, es relevante para entender por qué en un caso el tribunal revocó la sentencia de culpabilidad, mientras que en el otro, tras aclarar el estándar aplicable, devolvió el caso al foro primario. Si bien en Bagley el Tribunal Supremo Federal expresó que no existe diferencia entre la evidencia impugnatoria y la exculpatoria en cuanto a que ambas constituyen prueba beneficiosa al acusado, ello no quiere decir que cualquier prueba suprimida por el fiscal y

que sirva para impugnar a un testigo de cargo conlleva la revocación automática de una sentencia de culpabilidad.

De hecho, en Bagley -el mismo caso donde se hacen las referidas expresiones- el Tribunal Supremo Federal no revocó la sentencia de culpabilidad y optó por devolver el caso al foro primario para que fuera dicho foro quién evaluara la prueba, a la luz de la normativa adoptada y tomando en consideración el efecto acumulativo de la evidencia suprimida por el Estado. Esto es, enfrentado con dos casos donde la naturaleza de la evidencia suprimida era distinta -en Bagley se trataba de prueba impugnatoria de un testigo de cargo y en Kyles la prueba suprimida era prueba claramente exculpatoria, en el contexto de un caso de pena de muerte- el Tribunal Supremo Federal resolvió de manera distinta, devolviendo el caso al foro de instancia en el primero y revocando la sentencia de culpabilidad en el segundo.

A la luz de lo anterior, y tomando en consideración la forma en que el Tribunal Supremo de Estados Unidos ha aplicado la normativa que rige en estas circunstancias, somos del criterio que la Opinión del Tribunal incide al revocar automáticamente la sentencia condenatoria. Por ello, aunque coincidimos con la Opinión del Tribunal en que procedía revocar la determinación del foro apelativo, en atención a las acciones altamente cuestionables del Estado al negarse a descubrir prueba que podía beneficiar a la defensa, no podemos endosar la revocación automática de una sentencia de culpabilidad, en ausencia de una evaluación del impacto

acumulativo de la evidencia suprimida por parte del foro primario.

En vista de que el Tribunal opta por revocar la sentencia de culpabilidad y ordena la celebración de un nuevo juicio, sin darle oportunidad al foro de instancia para que evalúe la moción de nuevo juicio a la luz del estándar adoptado en el día de hoy, disentimos.


Federico Hernández Denton
Juez Presidente